DAVID W. HORNBECK ET AL. *v.* SOMERSET
COUNTY BOARD OF EDUCATION ET AL.

[No. 93, September Term, 1981.]

*Decided April 5, 1983.*

600

The cause was argued before MURPHY, C. J., and SMITH, COLE, DAVIDSON and COUCH, JJ., and ▪J. DUDLEY DIGGES and

CHARLES E. ORTH, JR., Associate Judges of the Court of Appeals (retired), specially assigned.

*George A. Nilson, Special Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General* and *Ellen M. Heller, Assistant Attorney General,* on the brief for the State and *Shale D. Stiller,* with whom were *Jay I. Morstein, James S. Jacobs, Julien A. Hecht, William L. Reynolds* and *Frank, Bernstein, Conaway & Goldman* and *Paul A. McGuckian, County Attorney,* on the brief for Montgomery County, appellants/cross-appellees.

*Richard W. Emory,* with whom were *Nell B. Strachan* and *Venable, Baetjer & Howard* on the brief and by *Elliott C. Lichtman,* with whom were *Joseph L. Rauh, Jr., John Silard, Mary M. Levy, James C. Turner* and *Rauh, Silard & Lichtman, P.C., Benjamin L. Brown, City Solicitor, Valentine A. Kogler, Jr., Assistant City Solicitor, Tony Bruce* and *Jones & Jones* and *Starke Evans* on the brief, for appellees/cross-appellants.

*Amicus curiae* brief filed by *Lee Havis.*

*Amicus curiae* brief of The Board of Education of Prince George's County filed. *Paul M. Nussbaum* and *John R. Barr* on the brief.

*Amici curiae* brief filed. *Thomas J. Wohlgemuth* for Board of Education of Anne Arundel County; *Charles A. Reese* and *Judith S. Bresler* for Boards of Education of Howard and Montgomery Counties; *Richard R. Bloxom* for Board of Education of Worcester County; *Thomas A. Rymer* for Board of Education of Calvert County and *Ernest Thompson* and *Lynn Leonhardt* for Board of Education of Talbot County on the brief.

*Amicus curiae* brief of Women Voters of Maryland, Inc. filed. *Melvin J. Sykes* on the brief.

*Amicus curiae* brief of Greater Baltimore Committee, Inc. filed. *Michael W. Lower* and *Smith, Somerville & Case* on the brief.

Murphy, C. J., delivered the opinion of the Court. Cole, J., dissents and filed a dissenting opinion at page 659 *infra*.

This case involves a challenge to the constitutionality of Maryland statutes which govern the system of financing public elementary and secondary schools in the State's twenty-four school districts, *i.e.,* in the twenty-three counties of Maryland and in Baltimore City. The litigation focuses upon the existence of wide disparities in taxable wealth among the various school districts, and the effect of those differences upon the fiscal capacity of the poorer districts to provide their students with educational offerings and resources comparable to those of the more affluent school districts.

## I

Maryland's public school system is administered pursuant to the provisions of the Education Article of the Maryland Code (1978). The State Board of Education, as head of the State Department of Education, is entrusted with the general care and supervision of the public elementary and secondary schools of the State; it is empowered to determine and carry out the State's public school policies and to adopt bylaws, rules and regulations for the administration of the system. Subject to the general authority of the State Board, the State Superintendent of Schools is responsible for the administration of the Department. A county Board of Education in each county and a Board of School Commissioners in Baltimore City, together with their local school superintendents, are vested with control over educational matters in their respective school districts. Subject to applicable bylaws, rules and regulations of the State Board, the local authorities are empowered to determine the educational policies within their own school districts.

The State's public school system is primarily financed by a combination of State and local tax revenues.[1] Section 5-201 of the Education Article provides (with certain exceptions) that all State funds appropriated by the General Assembly to aid in support of the public schools shall be included within the General State School Fund. Section 5-201 (c) directs payment of monies from the State School Fund for a number of specified public school expenses, including in subparagraph (12), the State share of "basic current expenses," a term defined in § 5-202 (a) (3) to mean (with designated exceptions) "the expenditures made by a county from State and county revenue for public elementary and secondary education." Section 5-202 (b) (1) provides that each school district shall receive from the State an amount for each school year representing the "State share of basic current expenses." Section 5-202 (b) (2) provides that the annual expenditure for "basic current expenses" in which the State will share is $690 (the statutorily prescribed "foundation" amount at the time suit was filed in this case) multiplied by the number of students enrolled. Section 5-202 (b) (3) specifies that to be eligible to receive the State share of basic current expenses, the subdivision's governing body "shall levy an annual tax sufficient to provide an amount of revenue for elementary and secondary public education purposes equal to the product of *the wealth of the county* and a uniform percentage determined for each fiscal year." (Emphasis added.)[2] Section 5-202 (b) (4) provides that the State share of basic current expenses for each school district "is the difference between the county share calculated under paragraph (3) of this subsection and the basic current expense to be shared [$690], as indicated in paragraph (2) of this subsection." Section 5-202 (a) (7) defines a subdivision's "wealth" to mean the sum of the assessed valuation of real property, public utility operating property, and net taxable income.

---

1. Federal aid is minimal, constituting approximately 8 percent of the total.
2. The subsection provides that the uniform percentage shall be determined as follows:

The present financing formula for "basic current expenses," as provided in § 5-202 (b), is popularly known as the Lee-Maurer formula, after its originators, then Lieutenant Governor Blair Lee and Delegate Lucille Maurer. The formula is intended to "equalize" for differences in local wealth by providing a larger amount of basic current expense aid to school districts with lesser wealth per pupil than to those with greater wealth. In operation, the formula works as follows: It sets a per pupil statutory "foundation" level ($690) which is the minimal base amount that each school district must spend annually per pupil. Of this amount the State pays 55 percent of the first $624 and 50 percent of the remaining $66. The local districts as a group pay the remaining 45 percent of $624, and 50 percent of $66. The actual distribution of the State share among local districts and the percentage of the foundation amount that each must provide from local tax revenues varies in accordance with the district's "wealth" as defined by § 5-202 (a) (7). The amount that each local district contributes is computed as follows: The total number of public school students enrolled in the State is multiplied by $624, and the product of that calculation by 0.45, yielding the first-tier share for all school districts. The total number of students is then multiplied by $66, and that product is multiplied by 0.50, yielding the local districts' second-tier share. The sum of the two — the total contribution of all 24 districts — is then divided by the total wealth of all 24 districts. The resulting percentage is a "uniform tax rate" to be applied by each district to raise its share of the $690 per pupil expenditure. The tax rate applied to each district's wealth per pupil yields the amount per pupil it must contribute toward the basic current expense of $690; the State pays the balance. Thus, the greater a district's wealth the more the uniform tax rate will raise, and the smaller the State's per pupil contribution; conversely,

---

"The sum of the basic current expenses to be shared for all of the counties shall be multiplied, for the first $624, by 0.45, for the additional $66, by 0.50 and this product shall then be divided by the sum of the wealth of all of the counties; the resulting quotient, expressed as a percentage rounded to the third decimal place, is the uniform percentage."

the less its wealth, the less the uniform rate will yield, and the larger the State's contribution. Each district's share is only the minimum mandated by the State, and each expends considerably more per pupil than the foundation amount. These additional expenditures by the local districts may be made without limitation as to amount without affecting the level of State aid received under the formula.

In addition to the State share of basic current expenses under § 5-202 (b), the State provides an amount equivalent to $100 per student to a school district having a population density of over 8,000 persons per square mile ("density aid"), a criterion met only by Baltimore City. Two-thirds of this amount must be used for certain programs for students with special educational needs that have resulted from educationally or environmentally disadvantaged environments. § 5-202 (c). This subsection also authorizes a State expenditure of $45 per student to qualifying school districts for the same purpose where eligibility for funds is established under Title I of the Elementary and Secondary Education Act of 1965. Other State aid is specially "targeted" to the twelve poorest school districts in the State for use in operating their local systems.

In addition to these appropriations from the State School Fund, the State provides substantially full funding for "categorical aid" to school districts (without adjustment for subdivision wealth) for various educational purposes, including payments for teachers' retirement and social security, educating handicapped children, vocational education and rehabilitation, student transportation costs, school construction costs, and other programs. § 5-201 (c) *et seq.*

The State share of basic current expenses in fiscal year 1980 amounted to $331,880,120, or 54 percent of the total; the local school districts appropriated $283,281,866, or 46 percent of the total basic current expenses for the 1980 fiscal year. State "categorical aid" to the school districts in the 1980 fiscal year amounted to $480,000,000 and density, compensatory and targeted aid amounted to $26,000,000.

In addition to these educational expenditures, each local subdivision spends substantial sums of money for the support of its local schools. Because of differences in assessed property valuations among the subdivisions, the amounts raised through local taxation and spent per pupil vary from district to district, depending upon the district's tax wealth and/or inclination to spend money to enhance the educational resources and opportunities available to its students. These discretionary local expenditures result in substantial spending imbalances between the districts — imbalances which are only partially offset by the State's equalization and other aid. Educational offerings in some school districts are therefore considerably greater than in others. That Maryland's system of financing its public schools is dependent in considerable part upon tax revenues raised by the local subdivisions and expended for the support of their local public school systems is thus entirely clear.

## II

On February 15, 1979, the Boards of Education of Somerset, Caroline and St. Mary's Counties, and the School Commissioners of Baltimore City, together with taxpayers, students, parents, public officials and the school superintendents in each subdivision (collectively the plaintiffs), filed a declaratory judgment action in the Circuit Court of Baltimore City. Characterizing their respective school districts as fiscally distressed, the plaintiffs claimed that the State's public school financing system violated (a) the Equal Protection Clause of the Fourteenth Amendment, (b) the equal protection guarantee of Article 24 of the Maryland Declaration of Rights, and (c) § 1 of Article VIII of the Maryland Constitution, which commands the General Assembly to "establish throughout the State a thorough and efficient System of Free Public Schools; and [to] provide by taxation, or otherwise, for their maintenance." [3] Named as

---

3. In its entirety, Article VIII of the Maryland Constitution reads as follows:

defendants in the action were the Comptroller of the Treasury, the State Superintendent of Schools, and, by intervention, Montgomery County, Maryland.

The complaint alleged that because of the insufficiency of school funds caused by the State's discriminatory, unequal and inadequate school financing system, the plaintiff school boards were unable to meet their constitutional obligations under state and federal equal protection guarantees or under the "thorough and efficient" clause of § 1 of Article VIII of the Maryland Constitution. In four separate causes of action, the plaintiffs alleged that the State's public school financing system unconstitutionally discriminates against and disadvantages all students in the State's fiscally distressed school districts by providing them lesser and inadequate educational opportunity; that the system unconstitutionally operates to the particular disadvantage of poor children attending public schools in the fiscally distressed school districts; that Maryland unconstitutionally discriminates against poor school children throughout the State by systematically denying equal educational opportunity to most of them; and that the State's public school financing system unconstitutionally discriminates against residents and taxpayers of Baltimore City by compelling them to impose unparalleled tax rates while still offering only a reduced level of education, a duality which promotes continuing "out-flight" of the City's tax base and threatens the City's fiscal vitality.

---

"Section 1. General Assembly to establish system of free public schools.

The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance.

"Section 2. Continuance of system in force at adoption of Constitution.

The System of Public Schools, as now constituted, shall remain in force until the end of the said first Session of the General Assembly, and shall then expire; except so far as adopted, or continued by the General Assembly.

"Section 3. School Fund.

The School Fund of the State shall be kept inviolate, and appropriated only to the purposes of Education."

In support of their action, the plaintiffs asserted in their complaint that Maryland's school districts vary widely in their taxable wealth and in their fiscal ability to support public education; that under the State's system of financing its public schools, the local school districts are required to raise from local tax revenues approximately two-thirds of the current expenses needed to operate their school systems; that wealth disparities between the school districts are such that the plaintiff districts are unable to raise revenues comparable to those of the wealthier districts because, at any given tax rate, the revenue yielded per child is substantially less than that yielded in the more affluent school districts; that this is so even if the poorer subdivisions tax at rates higher than those of the wealthier districts; that an aggravating cause of the reduced school funding capacity of Baltimore City results from its "municipal overburden" — a factor endemic to large cities having extreme population densities, great poverty and high crime rates, which necessitates expenditures of local revenues greater in amount than any other Maryland school district for non-school governmental services, such as police and fire protection; that the necessity for these greater expenditures for nonschool needs sharply limits the proportion of every locally raised revenue dollar which remains available for public schools; and that the Lee-Maurer equalization formula does not take Baltimore City's municipal overburden into account but instead erroneously assumes that local tax revenues are equally available for public schools in each school district. The complaint alleged that even though the Lee-Maurer formula undertakes to equalize for differences in local wealth by providing a larger amount of basic current expense aid to school districts with lesser wealth per pupil, the equalization occurs only up to the foundation level of $690 per pupil, which is less than one-half the State-local revenue per child of the average school district in the State; that because of their lower revenue and spending capacity educational offerings in the fiscally distressed school districts, *e.g.,* quality and quantity of professional staff, class sizes, school facilities, equipment and supplies, are con-

siderably less than those offered by school districts which are not fiscally distressed; that as a result of the fiscal incapacity of the plaintiff school districts, their students suffer from a diminished level of educational resources; that the State's public school financing system's heavy dependence on disparate local taxable wealth results in substantial differences in educational offerings and resources among the school districts.

The complaint also asserted that poor children in the plaintiff school districts require extra educational assistance to overcome learning disadvantages but receive less as a result of the State's discriminatory public school financing system; that families in poor school districts more often suffer low income, low educational attainment and higher unemployment than in the wealthier districts; that as a result children in poor school districts have learning deficiencies that can only be overcome by costly programs of compensatory education; that conditions associated with poverty impede learning progress; that the Lee-Maurer equalization formula fails to take into account that it costs substantially more to provide learning opportunities for poorer children; that these needs are not accommodated under the State's system of financing its public schools; that instead the system yields reduced and below average educational resources to the economically and educationally disadvantaged public school students; that the plaintiff school districts suffer from "educational overburden" in their higher concentration of poor children with special and greater educational needs; that 70 percent of the State's poorest children reside in fiscally distressed school districts with below average taxable wealth, with the result that these children are systematically relegated to below average wealth schools with reduced, unequal and inadequate educational offerings; and that although Baltimore City levies taxes at a rate higher than any other subdivision in Maryland, it provides below average public school funding to its students.

Plaintiffs sought a declaration of the finance system's unconstitutionality, together with injunctive relief if the General Assembly failed to enact a school finance system that comported with constitutional precepts.

The trial before Judge David Ross consumed over four months and produced a voluminous record, numbering many thousands of pages. Believing that the decisive issue in the case rested upon virtually undisputed facts, Judge Ross limited his formal findings of fact essentially to the following: He first found from the evidence that substantial disparities existed in tax wealth among the school districts. Judge Ross set forth a few comparisons to show the extent of the problem:

"While Calvert County had $138,318 of property wealth behind each pupil enrolled on September 30, 1979, St. Mary's County, Somerset County, Baltimore City and Caroline County had respectively only $34,939, $32,151, $28,375 and $27,762. The ratio of disparity between Calvert County and Caroline County was 5 to 1. In 1978, Montgomery County had a net per capita income of $7,059, while Somerset County had $2,408. Thus, the maximum fifty percent 'piggyback' income tax the subdivisions are permitted to impose raises in Somerset County only about one-third of the per capita amount it raises in Montgomery County. When wealth is measured by a combination of property and income per pupil enrolled on September 30, 1979 as defined by the Lee-Maurer formula, Worcester County had $129,850 per pupil while Somerset County, its contiguous neighbor, had only $39,107 per pupil, a disparity ratio of more than 3 to 1. If taxable wealth is defined as total property taxable for county purposes plus net taxable income, the disparity between Calvert County with $127,556 per pupil and Caroline County with $39,229 is also more than 3 to 1."

Judge Ross found from the evidence that the plaintiff subdivisions were able to raise far less in revenues per pupil than the affluent school districts; that if each subdivision were to tax its property at a rate of $2 per $100 of assessed valuation, Calvert County would raise $2,766 per pupil enrolled on September 30, 1979 while its contiguous neighbor St. Mary's County would raise only $699 per pupil; that Worcester County would raise $2,397 per pupil while its neighbor Somerset County would raise only $643 per pupil; and that Baltimore City and Caroline County would raise only $568 and $555 per pupil, respectively.

Judge Ross found as a fact that although the Lee-Maurer "basic current expenses" formula creates a perfect inverse relationship between wealth per pupil and State aid per pupil, State aid under the formula was insufficient to overcome the substantial disparities in local tax wealth. He explained:

"First, the current expense expenditure level specified in the Lee-Maurer formula is less than half the actual State average level of current expense. For example, in the 1978-79 school year, the average current local and State expense per student was $1,979, while the formula amount was $690. The formula amount was approximately one-fourth of the amount spent per pupil for current expenses in Montgomery County that year. Secondly, the use of categorical aid undercuts the equalization which the Lee-Maurer formula achieves. Although Somerset County received more than six times the basic current expense aid that its neighbor Worcester County received in fiscal year 1981, the former got a total of $595 in categorical aid and the latter $524. The disequalizing effect of categorical aid is obvious. The resulting total State aid to Somerset County was only twice that given to Worcester County despite an equalization effort under the Lee-Maurer formula of more than 6 to 1."

In finding from the evidence that spending disparities among the school districts were substantial and closely related to the disparities in subdivision wealth, Judge Ross, by way of example, indicated that in fiscal year 1979 Montgomery County spent $2,328 per pupil while Caroline County spent only $1,498 per pupil. Judge Ross set forth other examples of spending disparities among the school districts, from which he concluded that "a child in the wealthiest subdivision has approximately twice the amount spent on his education as a child in the poorest subdivision."

The trial judge further found from the evidence that the majority of indigent pupils in Maryland are clustered in the poorest subdivisions. He observed:

"The plight of plaintiffs' subdivisions is exacerbated by the fact that they have large numbers and concentrations of poor children who have special educational needs. For example, only 6% of Montgomery County students are eligible for federal Title I funds compared to 42%, 39%, 28% and 21% in Baltimore City, Somerset County, Caroline County and St. Mary's County, respectively."

Finally, as to Baltimore City, Judge Ross said:

"In addition, Baltimore City has less local revenue available for school funding than do the other subdivisions, because it must devote a greater portion of its tax base and its locally raised revenues to nonschool services. For example, in fiscal year 1979 although the two subdivisions raised approximately the same total local revenues per capita, Baltimore City spent $357 per capita for non-education expenditures, while its neighbor Baltimore County spent only $235 per capita. For Baltimore County this represented 47% of its total per capita revenues and left $1,549 to be spent per pupil for education. In contrast, Baltimore City spent 69.5% of its total per capita revenues for

non-education expenditures, which left only $789 per pupil for education. The State average for non-educational expenditures is 50% of total local revenue. Although the effective property tax rate in the City is almost twice that of the County (11.89 and 6.02 respectively), the County has almost twice as much in revenues available per pupil for educational expenditures after funding non-educational services."

Judge Ross held that the State's scheme of financing its public school system violated Article VIII of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights but that it did not offend the Equal Protection Clause of the Fourteenth Amendment. The trial judge first observed that the Supreme Court in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973), had considered whether the Texas school financing system, which was similar to the Maryland system, violated the federal equal protection guarantee. The Court in that case, as Judge Ross found, held that the plaintiffs had failed to establish financial need as a suspect class and that because education was not explicitly or implicitly guaranteed by the federal constitution, it was not a fundamental right, *i.e.,* it was not a right which requires application of a strict scrutiny analysis for purposes of determining whether there had been a denial of the federal equal protection guarantee. In holding that the Texas system did not violate the federal equal protection clause, the Court applied the rational basis standard of equal protection analysis; it concluded that the system furthered the legitimate state purpose of preserving local control. Judge Ross found no basis for distinguishing *Rodriguez* from the present case. He held, however, that *Rodriguez* did not resolve the plaintiffs' state equal protection claim since in *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), this Court held that the equal protection guarantees of the federal constitution and of Article 24 of the Maryland Declaration of Rights were independent of each other and capable of divergent effect.

Judge Ross held that the State's public school financing system did not comply with § 1 of Article VIII of the Maryland Constitution which requires that the General Assembly, by law, establish throughout the State a "thorough and efficient" system of free public schools and provide by taxation, or otherwise, for their maintenance. After extensively reviewing the history underlying the establishment and financing of Maryland's public school system, Judge Ross concluded that the "thorough and efficient" language of Article VIII was straightforward and unambiguous; that it required a system which by contemporary standards was "full, complete and effective in every part of the State and not just in those subdivisions which for whatever reason happen to have the revenue wealth to provide such." The court said that the words "thorough and efficient" denote "a level of quality and that standard must be established and maintained in every subdivision"; that the General Assembly must provide the funds to achieve this end; that more was required than "a bare framework for delivering a minimum basic education." Judge Ross opined that the public school system could not at the same time be thorough and efficient throughout the State when substantial disparities in spending existed between school districts, particularly when the only explanation for the disparities was the availability of funds. He said:

"If it takes $2,328 per pupil to provide full and complete schools in one county, it would seem that it would cost substantially the same to do so in the others. On the other hand, if $1,498 per pupil provides full and complete schools in one subdivision it can hardly be said that a system which permits expenditure of $2,328 and comparable amounts in other subdivisions is efficient. This is certainly true if one attributes to 'efficient' the concept of using the least wasteful means which is clearly a part of the current meaning of that word. It would seem that the system is either not full and complete in

the low spending subdivision or it is wasteful in the high spending one."

For reasons extensively outlined in his opinion, Judge Ross next concluded that even if the language of Article VIII was ambiguous and required construction, its history and contemporaneous construction dictated the same interpretation, *i.e.,* that a statewide free public school system be established which is full, complete and effective by contemporary standards throughout the State.

In summary, Judge Ross found from the evidence:

"that the present financing scheme significantly underfunds the plaintiffs' schools whose requirements are at least as great as any in the State, while it permits virtually unlimited spending in other subdivisions. As a result the quality of the schools in the plaintiffs' subdivisions is inferior to those in the wealthier subdivisions with respect to buildings, equipment, materials and staff."

Consequently, the court found that because the existing system failed to set a qualitative standard of education and to provide equal funding across the State, it was not "thorough and efficient" within the meaning of § 1 of Article VIII of the Maryland Constitution.

Judge Ross next considered whether Maryland's statutory scheme of financing its public school system violated the equal protection guarantee of Article 24 of the Maryland Declaration of Rights.[4] He determined that § 1 of Article VIII of the Maryland Constitution, unlike the federal constitution, explicitly guarantees the right of students and their

---

4. Article 24 provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Our cases recognize that the concept of equal treatment is embodied in the due process requirement of Article 24. *See, e.g.,* Attorney General v. Waldron, 289 Md. 683, 704, 426 A.2d 929 (1981).

parents to have the State establish and fund a thorough and efficient statewide system of free public schools; that because the right is constitutionally guaranteed, it is fundamental; that any system which discriminates invidiously with respect to furnishing a thorough and efficient system of free public schools necessarily impinges upon and interferes with that fundamental right and, for purposes of equal protection analysis, must be adjudged by the most rigorous standard, *i.e.,* strict scrutiny, which requires the proponents of the statute to demonstrate that the unequal treatment is necessitated by a compelling governmental interest. Judge Ross held that Maryland's system of financing its public schools provides unequal funding and unequal distribution of State revenues. He then noted that the specific complaint of the plaintiff school districts was not that the State has failed to offer each pupil the probably unachievable ideal of equal educational opportunity, but rather "that in establishing and maintaining the system of public schools mandated by Article VIII the State has done so unequally." The only question, he said, is whether unequal funding is constitutionally permissible. He explained:

> "The question is not whether the State is obliged to equalize the educational opportunities of all its children, but whether the State in establishing a statewide system in response to the constitutional mandate can do so unequally."

Judge Ross noted that "tax resource wealth" is public and is within the entire control of the General Assembly "in trust for all citizens of the State." He believed that all such revenue sources must be considered in determining how much money will be allocated to the public school system, stating that "[t]he State's revenues can be collected and spent locally only by express grant of power from the General Assembly."

Judge Ross said that because of naturally occurring disparities in wealth, local taxation and expenditure will frequently result in unequal distribution of the State's

assets. But, he said, "when the Constitution itself mandates establishment and maintenance of a statewide system, unequal distribution of the State's revenues can be justified only for the most compelling reason and as all agree there is none with respect to school finance." In summary, Judge Ross reiterated that "Article VIII requires the school system to be full and complete by contemporary standards throughout the State"; that Article 24 "requires equality for each pupil in the State"; that the "key determinant in achieving these mandated goals is funding"; and that

> "[t]he only practical and realistic way of determining and achieving equality is with respect to the division of the funds committed to education. Each pupil is entitled to a fair share of the funds available for education. This can be accomplished only by dividing the money equally on an accurate per pupil basis across the State."

Judge Ross recognized that the total amount to be spent on education is limited by the finiteness of revenues and the competing demands on those revenues. It is for the General Assembly, he repeated, which has control over all revenue sources within the State, to consider all such sources "in determining how much will be allocated to public schools." Judge Ross cautioned:

> "The General Assembly may not limit its ability to adequately fund education by permitting the subdivisions to have or retain excessive revenue collecting power nor may it permit unequal distribution of any revenues for public schools."

The trial judge held that Article 24 "requires mathematical equality among pupils with respect to distribution of funds," with some variations from exact dollar per pupil equality being permitted if "tailored with mathematical precision to a clearly demonstrated difference in cost."

Judge Ross deemed it unnecessary to determine whether the Lee-Maurer formula was unconstitutional for failure to

take Baltimore City's "municipal overburden" into account
since he held "the entire system . . . unconstitutional quite
apart from that possible shortcoming in the Lee-Maurer
formula." He nevertheless concluded that for purposes of
meeting constitutional requirements with respect to funding
education, "it is irrelevant who pays the taxes" since the
State Constitution requires "adequate and equal funding for
each pupil in the State"; and "[a] plan which relies on
illusory revenue sources and as a result fails to adequately
fund will not satisfy the requirements of equal protection."

All parties appealed from the trial court's decree. We
granted certiorari prior to decision by the Court of Special
Appeals to pass upon the issues of public importance raised
in the case.

### III

We first consider the meaning of § 1 of Article VIII of the
Maryland Constitution which requires that the General
Assembly establish "a thorough and efficient" system of free
public schools throughout the State and "provide by taxa-
tion, or otherwise, for their maintenance." Of course, if the
provisions of this section are clear and unambiguous, as the
trial judge held, no construction or clarification is needed or
permitted. See Brown v. Brown, 287 Md. 273, 412 A.2d 396
(1980); Johns Hopkins Univ. v. Williams, 199 Md. 382, 86
A.2d 892 (1952). Contrary to the position taken by Judge
Ross, however, the provisions of § 1 do not, in our view,
clearly and unambiguously compel the enactment of a stat-
ute mandating exact equality in per pupil funding and
expenditures among the State's school districts as the
constitutionally required means of establishing and main-
taining a "thorough and efficient" statewide system of free
public schools. The meaning of § 1 is by no means free from
doubt; the language of that section, on its face, is plainly
susceptible of more than one meaning. Accordingly, to ascer-
tain and effectuate the intent of the framers of the organic
law and the people adopting it, it is essential that we con-

sider the history underlying the enactment of § 1 and its contemporaneous construction by officials charged with administration of the government, including the legislature. *See Kadan v. Bd. of Sup. of Elections,* 273 Md. 406, 329 A.2d 702 (1974); *Johns Hopkins Univ. v. Williams, supra; Johnson v. Duke,* 180 Md. 434, 24 A.2d 304 (1942). In this regard, it has been held that a contemporaneous construction placed upon a particular provision of the Maryland Constitution by the legislature, acquiesced in and acted upon without ever having been questioned, followed continuously and uniformly from a very early period, furnishes a strong presumption that the intention is rightly interpreted. *See Wyatt v. State Roads Commission,* 175 Md. 258, 1 A.2d 619 (1938); *Humphreys v. Walls,* 169 Md. 292, 181 A. 735 (1935); *Trustees of the Catholic Cathedral Church of Baltimore v. Manning,* 72 Md. 116, 19 A. 599 (1890). And, in considering contemporaneous exposition in construing the meaning of a constitutional provision, Maryland courts have always afforded great weight to debates and proceedings held in the course of constitutional conventions. *See State v. Canova,* 278 Md. 483, 365 A.2d 988 (1976); *Johns Hopkins Univ. v. Williams, supra; McMullen v. Shepherd,* 133 Md. 157, 104 A. 424 (1918); *Baltimore v. State,* 15 Md. 376 (1860). Of particular importance in this connection are the proceedings of the 1867 Constitutional Convention, as reported in P. Perlman, *Debates of the Maryland Constitutional Convention of 1867* (1923). *See Kadan, supra,* 273 Md. at 412.[5]

## (A)

Although the Maryland Constitution of 1776 did not contain any provision relating to public school education, the General Assembly manifested its concern for educational matters in the early days of statehood. *See McCarthy v. Bd.*

---

5. Perlman's account of the 1867 Constitutional Convention debates is taken from detailed articles appearing in the Baltimore Sun throughout the period of the Convention's work.

*of Education of A. A. Co.,* 280 Md. 634, 374 A.2d 1135 (1977). Chapter 122 of the Acts of 1813 created a fund to establish a general system of free schools throughout the State; the proceeds of the school fund were to be divided equally among the counties. Chapter 256 of the Acts of 1816 directed the appointment of commissioners in each county to superintend the expenditure of the county's proportion of the State school fund. Chapter 162 of the Acts of 1825 undertook to establish a statewide system of free primary schools, under the supervision of a State Superintendent of Public Instruction. The counties were divided into school districts managed by district trustees. School construction was to be funded by local property taxes. State school fund revenues were to be apportioned in part on an equal basis among the school districts and partly on a school-age population basis. *See* Resolution 47, enacted by the General Assembly at its 1833 session. The 1825 Act permitted Baltimore City to establish its own separate school system, and it authorized any county, by vote of its electorate, to decline to establish any public school system.

Prior to 1864, the legislature's efforts to establish a statewide public school system were ineffective. Under the 1825 Act, Baltimore City maintained its own system and a number of counties voted not to establish public schools. Numerous public local laws were enacted by the General Assembly pertaining to public school education in various of the school districts. *See, e.g.,* Acts of 1827, ch. 173; Acts of 1830, chs. 14 and 160; Acts of 1837, chs. 306 and 353; Acts of 1847, ch. 279. The development of public schools was a matter left largely to the counties and to Baltimore City. *See* L. Blauch, *Education and the Maryland Constitutional Convention of 1864,* 25 Md. Hist. Mag. 169 (1930). An effort to include a provision in the Maryland Constitution of 1851 for a "uniform system of common school education" did not succeed. *See* 2 Maryland Constitutional Convention Debates 339 (1851). A bill to accomplish the same result was introduced in the 1853 session of the General Assembly but was not enacted.

It was not until adoption of the Maryland Constitution of 1864 that a statewide system of free public schools was established in this State. Article VIII, § 1 of that document required the Governor to appoint a State Superintendent of Public Instruction with responsibility to develop "a uniform system of free public schools." Section 2 of the article required the creation of a State Board of Education. Section 3 directed the appointment of school commissioners in each county in such numbers as the State Superintendent determined, the commissioners to be appointed by the State Board and to perform duties as directed by the State Superintendent or by the General Assembly. Section 4 directed the General Assembly to "provide a uniform system of free public schools, by which a school shall be kept open and supported free of expense for tuition in each school-district, for at least six months in each year." Section 5 required the General Assembly to levy an annual tax of not less than ten cents on each one hundred dollars of taxable property throughout the State, for the support of the free public schools, the funds to be distributed among the counties and Baltimore City in proportion to their respective population between the ages of five and twenty years. This section prohibited the General Assembly from levying "any additional school-tax upon particular counties, unless such county express by popular vote its desire for such tax." Section 5 also authorized Baltimore City "to provide for its additional school-tax as at present, or as may hereafter be provided by the General Assembly, or by the mayor and city council of Baltimore." Section 6 directed the General Assembly to provide "a fund for the support of the free public schools of the State, by the imposition of an annual tax of not less than five cents on each one hundred dollars of taxable property throughout the State," the proceeds thereof to be known as "the public-school fund," and invested until the fund amounted to six million dollars, after which the ten cent tax required by § 5 could be discontinued, if the General Assembly so determined. Section 6 further provided that the school fund would remain "forever inviolate as the free public-school fund of the State," the interest therefrom

to be disbursed for educational purposes only, as prescribed by law.

Article VIII of the Constitution of 1864 was fully implemented by ch. 160 of the Acts of 1865, which made comprehensive provision for a uniform system of free public schools throughout the State, including the imposition of a fifteen cent tax on each one hundred dollars of assessable property throughout the State, to be disbursed to the counties and Baltimore City in proportion to population between the ages of five and twenty years. Although the 1864 Constitution did not prohibit school districts from raising additional funds through the imposition of local subdivision taxes to supplement grants from the State school fund, the 1865 statute provided that after January 1, 1867, no county or Baltimore City could impose taxes for the support of the public schools in their respective subdivisions.

The "uniform" public school system established by Article VIII of the Constitution of 1864 was of short-lived duration.[6] At the Maryland Constitutional Convention of 1867, a new Education Article was reported to the Convention by its twenty-five member Education Committee; it was adopted by the Convention without amendment and was identical in form and wording with what later became Article VIII of the Maryland Constitution of 1867. *See* Perlman, *Debates,* at 148. As proposed, the new Education Article did not contain any provision, as then existed in the 1864 Constitution, for the appointment of designated State education officials, for the mandatory imposition of State property taxes in specified amounts to fund the statewide system, or for the distribution and allocation of such tax revenues among the counties and Baltimore City. Nor did the new article contain a provision, as in the 1864 Constitution, that the statewide

---

**6.** History indicates that the uniform public school system was favored by the "Unionists" who sought to remove local control of education from the local subdivisions. Because soldiers of the Union Army, then quartered in Maryland, were permitted to vote on the adoption of the 1864 Constitution, some historians speculate that the document's ratification did not represent the will of a majority of Maryland's citizenry. *See* L. Blauch, *The First Uniform School System of Maryland,* 1865-1868, 26 Md. Hist. Mag. 205, 225-226 (1931).

school system be "uniform." The new article required only that the free statewide system be "thorough and efficient," and funded "by taxation, or otherwise." It also directed that the existing "uniform" system would expire at the end of the first year after the adoption of the new constitution, unless the legislature elected to continue it.

Although no official transcript of the debates of the 1867 Convention was made, considerable historical evidence exists respecting the Convention's proceedings. As reported in Perlman, *Debates of the Maryland Constitutional Convention of 1867,* at 198-203, 243-48, and 251-56, a number of delegates expressed dissatisfaction with the "uniform" public school system created by the 1864 Constitution; they urged its termination. Some delegates assailed the large expense associated with the operation of the uniform system, with its centralized administration, lack of local control, and with the performance of the Superintendent of Public Instruction. Members of the Convention's Education Committee, in explaining the proposed new article to the delegates, said that it did not provide for a uniform system; that the subject "of incorporating into the constitution a detailed system was thoroughly discussed"; that the committee was of the "unanimous conclusion ... that the constitution should not be encumbered with the details"; and that the "best plan was to leave the details . . . to the legislature." The comments of Delegate Kilbourne, a member of the Education Committee, appear to reflect the sentiment of the Education Committee. As reported in Perlman, *Debates,* at 200-01, Kilbourne "wanted this matter left to the Legislature." He said that

> "He had been for abolishing the present system . . . [and] in no shape or form would he consent that the system should continue one day beyond the time indicated in this article, [June 11, 1867] . . . . The committee had ample evidence of the almost entire voice of the people of Maryland against the system. The reason why he was willing to leave this matter

to the Legislature was because he was thoroughly convinced that no section of the State would send a delegate to the Legislature who would not be in favor of abolishing the present system. The enormous expenses of the system, the mode of raising the money and the mode of expending it, and the power of the superintendent, are all reasons why this system should be dispensed with. . . . The whole system has radical, fundamental objections. It would be supposed that it would be right to commit the expenditure of the funds to those who contributed them, but these funds are placed beyond the control of every parent and guardian in the State; those who bear the burdens are denied all share in their direction."

A number of amendments were nevertheless proposed to the Education Committee's report. One delegate, Page of Somerset County, urged that the uniform system should be continued throughout the State. Perlman, *Debates,* at 203. Delegate McMaster of Worcester County also favored continuation of the uniform system. *Id.* at 245-46. Other delegates sought to amend the committee's report to include a constitutional provision authorizing Baltimore City to maintain its own separate school system. *Id.* at 201-04, 243-51. Another amendment sought to substitute an entire new education article in place of the committee's report; it proposed incorporating detailed provisions into the constitution assuring local control over the public schools. *Id.* at 253-55. Delegate Barnes urged that "the ends of popular education can best be served by committing the whole question to the control of the several counties, and the city of Baltimore, respectively, to be conducted in each according to the wants and desires of the people." Perlman, *Debates,* at 252. According to Perlman, Delegate Barry urged adoption of the education article submitted by the committee "as the Legislature would have the power to create a new system, and it would be perfectly competent to give to the city of Baltimore such a system as she now has, or any system

which she may desire in lieu of it. He was in favor of leaving this matter to the Legislature, where it properly belonged." *Id.* at 251. Delegate Vansant, a member of the Education Committee, advocated adoption of the proposed new education article without change, stating that future details of the system "should be left to the Legislature, which would assemble in January next after the adoption of the constitution." *Id.* at 255. Similar sentiments were expressed by other delegates, some of whom were on record as favoring county control of the public schools and/or a separate school system for Baltimore City. The central theme emerging from the debates was not to encumber the new education article with details beyond those provisions proposed by the committee, so as to permit the legislature to adopt any system, including a uniform system, and to implement it by statute.

None of the proffered amendments to the proposed new education article were adopted by the Convention and it was passed with only five dissenting votes. *Debates,* at 439. A resume of the work of the Convention was printed in *The Baltimore Sun* after the Convention's adjournment. It was there reported that the education article "makes it incumbent on . . . [the legislature], at its first session to provide for a new system, all the details of which, including the rate of taxation, are left to it." *Id.* at 36.

Perlman's accounts of the proceedings at the 1867 Constitutional Convention are confirmed by articles appearing in *The Baltimore American and Commercial Advertiser,* the *Baltimore Daily Commercial* and the *Baltimore Gazette.* In various articles, these newspapers reported that it was the intention of the Convention delegates in adopting the new education article to leave implementation of the details of the public school system to legislative determination. For example, Delegate McKaig, a member of the Education Committee, was quoted as saying: "[t]he object of the committee was to leave the Legislature entirely untrammelled." *Baltimore American,* June 21, 1867, at 4. Delegate Page was reported to have unsuccessfully introduced a motion to amend the first sec-

tion of the new education article to require "a thorough, efficient and *uniform*" free public school system. *Id.,* June 12, 1867, at 4 (emphasis supplied). It was reported that efforts to include a constitutional provision guaranteeing local control of the public schools, and for a separate system in Baltimore City, were blunted by the firm position espoused by Education Committee members, most of whom favored local control, that the legislature be left free to adopt the system it deemed best. *Id.* June 12 and 22, at 4. *See also Baltimore Daily Commercial,* June 12, 1867, at 4. *The Baltimore Gazette,* in its issue of June 22, 1867, at 4, quoted Delegate Wickes as saying:

> "I am in favor of reserving to the Legislature full authority to provide for a system of education in each county and the city of Baltimore according to the local wants of each section, and opposed to any amendment which should require the Legislature to provide a uniform system. The construction of the Article reported by the committee leaves, in my opinion, no doubt upon this question. The report does not provide for a uniform system, but only for a thorough and efficient system of education, and I entertain no doubt that under the power contained in this section the Legislature has full authority over the subject. There is also, Mr. President, full authority reserved to the Legislature to provide by taxation for the maintenance of public schools. This authority is properly confided to the Legislature, as they will be able to decide the amount of taxes necessary to be levied and to apportion the taxes to the new assessment which has been made or will hereafter be perfected. No system of public schools can be perfected in a constitution. The details of the system cannot be given. It is a question which no man in his closet can satisfactorily arrange, but must depend upon experience and be subject to amendment and alteration when the practical operation of this system demonstrates the necessity for such amendment."

Another member of the Education Committee, Delegate Tarr, told the Convention delegates that they were sent to accomplish two purposes — "to provide for the termination of the present system" and to make provision "for the establishment of a more economical and satisfactory system than the one now in existence." *See Baltimore Gazette,* June 22, 1867, at 4. Other articles reported that a number of the members of the Education Committee had objected to the great expense entailed by operation of the uniform system; the question of the amount of the tax levy to support the school system, according to the Chairman of the Education Committee, was also for the legislature to determine. *See Baltimore Gazette,* June 20, 21 and 22, at 4; *Baltimore American,* June 12 and 22, at 4.

Following ratification of the Constitution of 1867, the provisions of Article VIII were implemented by ch. 407 of the Acts of 1868, which enacted a new public education article. The statute made provision for a general system of free public schools throughout the State. Educational matters affecting a county were placed under the superintendence of Boards of County School Commissioners. The Act required imposition of a ten-cent statewide property tax to support the free public school system throughout the State, to be distributed to the City and to the counties on a school-age population basis. The statute specified that the State School Fund was to pay the salaries of teachers in the counties, and the expense of school books and stationery; and that if in apportioning the School Fund among the counties and Baltimore City, the share of any county was inadequate, the county could impose a local property tax sufficient to satisfy the deficiency; and that county voters could also impose other and additional taxes for public school purposes.

The 1868 Act authorized Baltimore City to establish its own system of free public schools and to delegate the superintendence thereof to the local Board of School Commissioners. The Act authorized Baltimore City to levy taxes

upon property within the subdivision as was necessary to defray the City's separate educational system.[7]

The equalizing effect of the even distribution of the proceeds of the State school tax among the school districts on a population basis, as directed by the 1868 statute, was offset by the authority vested in local governments to levy additional property taxes for school purposes and to spend them as each saw fit. As a result, very substantial per pupil spending disparities existed among the State's school districts for the 55 years immediately following adoption of the 1867 Constitution. Due to the great variance in educational resources and opportunities among the school districts, the legislature, by ch. 844 of the Acts of 1914, directed that a study be made of the State's public school system and its financing. The study, done by Abraham Flexner and Frank Bachman, reported that from 1870 through 1914, the local subdivisions raised approximately two-thirds of the total funds expended for public school purposes, with the State providing the remaining third. The authors reported that because the State's wealth was unevenly distributed among its subdivisions, major differences existed between the school districts in per pupil expenditures. They recommended adoption of a financing formula to lessen the impact of wealth-based disparities among the subdivisions whereby the State would provide greater aid to the poorer districts, thereby better equalizing educational opportunities among the State's school children. Specifically, it was recommended that there be a single state school fund; that the State provide free textbooks, reference and instructional materials to all students; that the State require each subdivision to impose a minimum tax levy as a precondition to receiving its State apportionment; and that the State school fund be distributed in light of three factors: (1) the school population between six and fourteen years of age, (2) school attendance, and (3) the comparative wealth of

---

7. By ch. 311 of the Acts of 1870, the legislature created a Board of State School Commissioners to superintend the public school system. The name of the Board was changed by ch. 377 of the Acts of 1872 to "State Board of Education." The office of Superintendent of Public Education was recreated by ch. 428 of the Acts of 1900.

the school districts. *See* A. Flexner and F. Bachman, *Public Education in Maryland* (1921).

The formula recommended by the Flexner-Bachman report was implemented by ch. 382 of the Acts of 1922. That statute, for the first time, provided an equalization formula for reducing the impact of wealth disparities among the school districts. It contained a minimum foundation program to support basic educational needs, while permitting the subdivisions to supplement the foundation level with additional locally generated tax revenues.

The financing formula under the 1922 statute was continued without essential change for a number of years, although through legislative adjustment, the foundation level program was periodically increased, resulting in greater equalization among the school districts.[8] Efforts by the State to improve the equalization formula to provide more funds to the poorer subdivisions were continuous. A number of gubernatorial and legislative commissions studied the financing formula and made recommendations for its improvement; none of them suggested that Article VIII of the 1867 Constitution required equal per pupil funding and expenditures among the State's school districts, recognizing instead the principle of shared responsibility between State and local governments for public school education and emphasizing the need for a measure of local control and initiative.[9] The work of these commissions led to the enactment of a number of legislative enhancements of the equalization formula and of the amount of State aid given to the less affluent school districts.[10] And, as previ-

---

**8.** *See, e.g.,* ch. 121, Acts of 1927 (increasing allowance for high school teachers); ch. 152, Acts of 1929 (establishing aid for handicapped children); ch. 261, Acts of 1933 (adding certain transportation costs to the equalization formula); ch. 502, Acts of 1939 (increasing minimum teachers' salary); and ch. 1, Acts of 1958 (increasing aid per classroom unit).

**9.** *See, e.g.,* Report of Maryland Commission to Re-Study and Re-Evaluate the Philosophy and Practices of the Finances of the Public Schools (the Green Commission, 1962); Report of Senate Committee on Taxation and Fiscal Matters of 1963 (the Hughes Committee); and Report of the Commission to Study the State's Role in Financing Public Education (the Hughes Commission, 1971).

**10.** *See, e.g.,* ch. 17, Acts of 1964 (the inclusion of taxable income in the wealth base for equalization purposes); ch. 325, Acts of 1970 (increasing aid to handicapped children); and ch. 4, Acts of 1970 (adding $20,000,000 to the

ously indicated the Lee-Maurer basic current expense formula, enacted by ch. 360 of the Acts of 1973, represented another major effort at improved equalization. The latest commission to consider the equalization problem — the Task Force to Study State-Local Fiscal Relationships — was appointed in 1979 and its recommendations to substantially increase the per pupil foundation level and for other improvements to the financing formula have now been adopted by the legislature. *See* ch. 531, Acts of 1980.[11]

### (B)

It is manifest from the history underlying the adoption of Article VIII of the 1867 Constitution, and from the consistent interpretation and application of its provisions by the legislative and executive branches of the State government for more than one hundred years, that the "thorough and efficient" language of § 1 does not mandate uniformity in per pupil funding and expenditures among the State's school districts.[12] The words of § 1 require no more than that the General Assembly, by law, establish a "thorough and efficient" system of free public schools throughout the State, funded by taxation or otherwise. That the general language of this constitutional directive constituted a clear departure from the specific and detailed education article provisions contained in the 1864 Constitution is clear. It is equally clear that nothing in the provisions of the newly adopted § 1 compelled the legislature to enact a law requiring that the funds raised to support the public school system be apportioned in any particular way. Nor did the provisions of § 1, either explicitly or implicitly, inhibit local subdivisions from

---

equalization fund, for distribution under a new formula in inverse proportion to per pupil subdivision wealth).

**11.** In Mills v. Lowndes, 26 F. Supp. 792 (D. Md. 1939), the court (Chesnut, J.) concluded that Maryland's Constitution did not obligate it to provide any equalization fund.

**12.** We recognize the rule that no construction or interpretation of a constitutional or statutory provision, no matter of what duration, can alter its plain meaning or purpose. *See* Baltimore Bldg. & Const. Trades v. Barnes, 290 Md. 9, 427 A.2d 979 (1981); Hope v. Baltimore County, 288 Md. 656, 421 A.2d 576 (1980); Johns Hopkins Univ. v. Williams, 199 Md. 382, 86 A.2d 892 (1952). The rule has no application in the circumstances of the present case.

spending locally generated tax revenues for public school purposes in supplementation of amounts to be received from the state school fund. Obviously, in light of the historical evidence, the words "thorough and efficient," in the context of their usage in § 1, are not the equivalent of "uniform." Nor do these words impose upon the legislature any directive, in its establishment of the public school system, to so fund and operate it that the same amounts of money must be allocated and spent, per pupil, in every school district in Maryland. To conclude that a "thorough and efficient" system under § 1 means a full, complete and effective educational system throughout the State, as the trial judge held, is not to require a statewide system which provides more than a basic or adequate education to the State's children. The development of the statewide system under § 1 is a matter for legislative determination; at most, the legislature is commanded by § 1 to establish such a system, effective in all school districts, as will provide the State's youth with a basic public school education. To the extent that § 1 encompasses any equality component, it is so limited. Compliance by the legislature with this duty is compliance with § 1 of Article VIII of the 1867 Constitution.

In so concluding, we have considered cases from other jurisdictions with state constitutions having a "thorough and efficient" education clause or like provision. *Danson v. Casey,* 484 Pa. 415, 399 A.2d 360 (1979), involved a challenge to the statutory system by which the Philadelphia school district was funded under a state constitutional provision requiring that the legislature provide for the maintenance and support of a "thorough and efficient system of public education." Pennsylvania's statutory scheme, like Maryland's, contained two primary sources of funding — state and local taxation. State funds were distributed pursuant to a formula akin to Maryland's foundation level program for basic current expenses. Local tax revenues constituted the major source of school funding. It was contended that the "thorough and efficient" clause mandated exact equality of funding among the school districts.

The Supreme Court of Pennsylvania rejected that claim. It said that the framers of the Pennsylvania Constitution had "considered and rejected the possibility of specifically requiring the Commonwealth's system of education be uniform." 399 A.2d at 367. Instead, the court noted that in enacting the "thorough and efficient" clause, the framers had "endorsed the concept of local control to meet diverse local needs" and had recognized "the right of local communities to utilize local tax revenues to expand educational programs subsidized by the state." *Id.* The court said that because the legislative scheme for financing public education bore a reasonable relation to providing for the maintenance and support of a "thorough and efficient" system of public schools, it had fulfilled its constitutional duty. In this regard, the court noted that the plaintiffs had not established that any child was denied a basic, adequate or minimum education. *Id.* at 365.

Similarly, Ohio's Constitution contains a provision requiring "a thorough and efficient system of common schools." *Bd. of Ed. of City Sch. Dist., Etc. v. Walter,* 58 Ohio St. 2d 368, 390 N.E.2d 813 (1979), *cert. denied,* 444 U.S. 1015, 100 S. Ct. 665, 62 L. Ed. 2d 644 (1980), involved a suit to declare Ohio's system of financing public school education to be unconstitutional under this provision. The Ohio school financing system guaranteed an equal amount of state basic aid to every school district where local tax effort raised a preset level of revenue. A second tier of funding known as "reward for effort," gave more money to districts which raised more than the minimum level. 390 N.E.2d at 816. The court noted that this funding formula was intended to assure that each school district had the means to comply with state minimum standards. Therefore, the court held that even though local districts received differing amounts under the program, Ohio's conspicuous efforts to ensure that each child received an adequate education (*i.e.,* in terms of established statewide standards) met the requirements of the state constitution's "thorough and efficient" clause. *Id.* at 825. Indeed, the court noted that several plaintiff jurisdictions

alleged to be "starved for funds," actually were offering programs and services in excess of the minimum standards. *Id.* at 825-26. The court stated "[t]he fact that a better financing system could be devised which would be more efficient or more thorough is not material." *Id.* at 826.

Colorado's Constitution requires that the legislature create "a thorough and uniform system of free public schools throughout the state . . . ." In *Lujan v. Colorado State Bd. of Educ.,* Colo., 649 P.2d 1005 (1982), the state's statutory scheme of financing public elementary and secondary education was challenged as being in violation of this constitutional provision. As in Maryland, Colorado's school districts vary widely in taxable wealth and are funded by a combination of local and state taxes. Because of wealth-based disparities between the state's local subdivisions, the amounts raised and spent per pupil varied among the school districts. *Id.* at 1013-14. Responding to a challenge based on these disparities, the court said that the "thorough and uniform" clause "is not a mandate for absolute equality in educational services or expenditures" but rather a direction that the legislature "provide to each school age child the opportunity to receive a free education, and to establish guidelines for a thorough and uniform system of public schools." *Id.* at 1018-19. The court said that the constitutional provision is satisfied "if thorough and uniform educational opportunities are available through state action in each school district," *id.* at 1025; and that while each school district must be given the control necessary to implement the constitutional mandate at the local level, the constitutional provision "does not prevent a local school district from providing additional educational opportunities beyond this standard . . . [nor does it] require that educational expenditures per pupil in every school district be identical." *Id.*

In *Board of Educ., Levittown, Etc. v. Nyquist,* 57 N.Y.2d 27, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982), *appeal dismissed for want of a substantial federal question,* U.S., 103 S. Ct. 775, 74 L. Ed. 2d 986 (1983), it was contended

that New York's system of financing its public schools violated the state's constitutional provision that the legislature provide for the maintenance and support of "a system of free common schools, wherein all the children of this state may be educated." In that case, "property poor" school districts complained that under New York's system of public school financing, funds raised by locally imposed taxes were augmented by allocations of State money in accordance with a variety of formulas and grants, the effect of which resulted in grossly disparate financial support and grossly disparate educational opportunities among the state's school districts. The gravamen of the complaint was "that property-rich districts have an ability to raise greater local tax revenue enabling them to provide enriched educational programs beyond the fiscal ability of the property-poor districts." 439 N.E.2d at 362. The court recognized that "significant inequalities" existed in the amount of available financial support for some local districts, primarily due to municipal overburden and wide variances in local property assessment bases. Additionally, the court assumed that a significant correlation existed between amounts of money expended and the quality and quantity of educational opportunity provided. The court noted the absence of any allegation that educational offerings in the plaintiff school districts fell below the statewide minimum standards promulgated by the New York Board of Regents.

Turning to the state constitution education article, the court attached significance to the provision's adoption in 1894 — "at a time when there were more than 11,000 local school districts in the State, with varying amounts of property wealth offering disparate educational opportunities." *Id.* at 368. Additionally, the court explained that the education article made no reference to any requirement that the "education to be made available be equal or substantially equivalent in every district," nor was "there any provision either that districts choosing to provide opportunities beyond those that other districts might elect or be able to offer be foreclosed from doing so, or that local control of

education, to the extent that a more extensive program were locally desired and provided, be abolished." *Id.* Instead, what was intended, according to the court's analysis of contemporaneous documentary evidence, was "a State-wide system assuring minimal acceptable facilities and services in contrast to the unsystematized delivery of instruction then in existence within the State." *Id.* Therefore, since the minimum state standards currently in effect were concededly being met, the court held that the constitutional mandate of the education article was satisfied.

*Olsen v. State,* 276 Or. 9, 554 P.2d 139 (1976), involved a challenge to Oregon's constitutional provision requiring "a uniform and general system of Common schools." The court there said that the "uniform" language in Oregon's Constitution was satisfied as long as "the state requires and provides for a minimum of educational opportunities ... and permits the districts to exercise local control over what they desire, and can furnish, over the minimum." 554 P.2d at 148. *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975), involved that state's constitutional provision requiring "a general, uniform and thorough system of public, free common schools." The court there adopted the view that uniformity of size and property values among school districts was not essential to a general and uniform system; such a system, it held, is one in which every child in the state has free access to certain minimum and reasonably standardized educational and instructional facilities and opportunities to at least the twelfth grade. *Id.* at 652. The court concluded that the "uniform" provision did not guarantee a right to be educated in such a manner that all services and facilities would be equal throughout the state. The court relied on the contemporaneous exposition of the framers of the Idaho Constitution, finding no indication in the debates of any requirement that the school system be equal or that all individuals were entitled to "completely equal educational expenditures." *Id.* at 648. In *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973), the state constitution required "a general and uniform public school system." Although wealth

disparities existed among the school districts, the court said that the Arizona school financing system was nevertheless uniform. "Uniformity," to this court, was satisfied because all Arizona public schools were free, available to all persons aged six to twenty-one, and open for a minimum of six months per year. *Id.* at 592.

The Georgia Constitution makes it a "primary obligation" of the state to provide "an adequate education to the citizens of Georgia." Under that state's school financing system, the primary fund sources are state and local revenues. The bulk of the state money is distributed for "basic educational needs," allotted pursuant to the average daily attendance per local district. To receive this aid, each district must contribute a set amount obtained from ad valorem taxation, referred to as "required local effort." Local jurisdictions, however, may supplement this program with funds generated by local property tax assessments. In *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981), it was claimed that these local contributions, combined with the low level of state support, violated the state education clause. The court concluded from the evidence that a direct relationship existed between a district's level of funding and the educational opportunities which a school district is able to provide its children. *Id.* at 160. Nevertheless, it held that the "adequate education" provisions of the state constitution "do not restrict local school districts from doing what they can to improve educational opportunities within the district, nor do they require the state to equalize educational opportunities between districts." *Id.* at 164. Furthermore, the court found that the legislature had not disregarded its obligation to provide an "adequate" education, as evidenced by the massive state financial commitment to public education. The court stated that "while an 'adequate' education must be designed to produce individuals who can function in society, it is primarily the legislative branch of government which must give content to the term 'adequate.' " *Id.* at 165.

Both the New Jersey and West Virginia Constitutions contain provisions requiring the establishment of a

"thorough and efficient" system of free public schools. In *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, *cert. denied,* 414 U.S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (1973), the Court recognized the existence of wealth-based spending disparities among local school districts. It held that the "thorough and efficient" clause required equality of expenditures for a minimum mandated educational opportunity, *i.e.,* one "which is needed in the contemporary setting to equip a child for his role as a citizen and as a competitor in the labor market." *Id.* at 295.The Court noted that the State had never established even minimal statewide standards for education; that absent such standards the tax burden could not be "left to local initiative with any hope that statewide equality of educational opportunity will emerge." *Id.* The Court said that the State must compel the local districts to raise the money to provide for the constitutionally mandated education and that it could also authorize local governments to spend beyond the constitutionally mandated minimum education.[13]

As in *Robinson v. Cahill, supra,* the court in *Pauley v. Kelly,* 255 S.E.2d 859 (W. Va. 1979), found an absence of educational standards to "set the core values" for the state's public school system. *Id.* at 878. Without actually deciding that the state's educational system was so deficient as to violate the "thorough and efficient" clause of the state constitution, the court remanded the case for the development of educational qualitative standards consistent with the constitutional directive and for testing to determine whether each school district would be in compliance with the newly developed standards. In so ruling, the court emphasized that "great weight will be given to legislatively established standards, because the people have reposed in that department of government 'plenary, if not absolute' authority and responsibility for the school system." *Id.* Moreover, the court

---

**13.** New Jersey's legislature appears unwilling or unable to obey the "constitutional mandate" set forth in the *Robinson* case. The state is now in its seventh round of school financing litigation. *See* Robinson v. Cahill, 70 N.J. 155, 358 A.2d 457 (1976).

stated that "[m]ere rote comparison with other more affluent counties does not necessarily serve to define the values of such a system." *Id. See also Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied,* 449 U.S. 824, 101 S. Ct. 86, 66 L. Ed. 2d 28 (1980).

In contrast to New Jersey and West Virginia, Maryland has, by legislation, and by regulations and bylaws adopted by the State Board of Education, established comprehensive statewide qualitative standards governing all facets of the educational process in the State's public elementary and secondary schools. *See* Code, Education Article; COMAR Title 13A. No evidentiary showing was made in the present case — indeed no allegation was even advanced — that these qualitative standards were not being met in any school district, or that the standards failed to make provision for an adequate education, or that the State's school financing scheme did not provide all school districts with the means essential to provide the basic education contemplated by § 1 of Art. VIII of the 1867 Constitution. The trial court did not find that the schools in any district failed to provide an adequate education measured by contemporary educational standards. Simply to show that the educational resources available in the poorer school districts are inferior to those in the rich districts does not mean that there is insufficient funding provided by the State's financing system for all students to obtain an adequate education.

The record in this case demonstrates that Maryland has continuously undertaken to provide a thorough and efficient public school education to its children in compliance with Article VIII of the Maryland Constitution. That education need not be "equal" in the sense of mathematical uniformity, so long as efforts are made, as here, to minimize the impact of undeniable and inevitable demographic and environmental disadvantages on any given child. The current system, albeit imperfect, satisfies this test.

## IV

We next consider whether Maryland's system of financing its public schools violates either the equal protection clause of the fourteenth amendment or the concept of equal treatment embodied in Art. 24 of the Maryland Declaration of Rights *(see* footnote 4, *supra).* These provisions are in *pari materia* and generally apply in like manner and to the same extent; nevertheless, the two provisions are independent of each other so that a violation of one is not necessarily a violation of the other. *Attorney General v. Waldron,* 289 Md. 683, 704-05, 426 A.2d 929 (1981); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980); *Governor v. Exxon Corp.,* 279 Md. 410, 423, 372 A.2d 237 (1977), *aff'd,* 437 U.S. 117 (1978). We have, however, long recognized that decisions of the Supreme Court interpreting the equal protection clause of the federal constitution are persuasive authority in cases involving the equal treatment provisions of Article 24. *Waldron, supra,* 289 Md. at 705; *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748 (1974).

It is well recognized that the constitutional guarantee of equal protection of the law is afforded to all persons under like circumstances in the enjoyment of their civil and personal rights. *Leonardo v. County Comm.,* 214 Md. 287, 304, 134 A.2d 284 (1957), *cert. denied,* 355 U.S. 906; *Tatlebaum v. Pantex Mfg. Corp.,* 204 Md. 360, 369, 104 A.2d 813 (1954). Our cases hold that where all persons who are in like circumstances are treated the same under the laws, there is no deprivation of equal protection, but a law which operates upon some persons or corporations, and not upon others like situated or circumstanced, or in the same class, is invalid. *Waldron, supra,* 289 Md. at 726; *Wheeler v. State,* 281 Md. 593, 603, 380 A.2d 1052 (1977); *Salisbury Beauty Schools v. St. Bd.,* 268 Md. 32, 60, 300 A.2d 367 (1973).

We have frequently considered the standard of review to be applied in determining whether the equal protection or equal treatment guarantees of the fourteenth amendment or Article 24 have been violated by a challenged enactment.

*See, e.g., Washabaugh v. Washabaugh,* 285 Md. 393, 404
A.2d 1027 (1979); *Attorney General v. Johnson,* 282 Md. 274,
385 A.2d 57 (1978); *Wheeler v. State, supra; Governor v.
Exxon Corp., supra; Davidson v. Miller,* 276 Md. 54, 344
A.2d 422 (1975); *Matter of Trader,* 272 Md. 364, 325 A.2d
398 (1974); *Bureau of Mines v. George's Creek, supra. Attorney General v. Waldron, supra,* affords a concise distillation
of the controlling principles. "Strict scrutiny" is required of
a legislative classification when it creates a distinction
based upon "suspect" criteria or when it deprives, infringes
upon, or interferes with personal rights or interests deemed
to be "fundamental." 289 Md. at 705-06. Laws which are
subject to this rigorous standard violate the equal protection
guarantee unless the State can demonstrate that the statute
is necessary to promote a compelling governmental interest.
*Id.* at 706. A suspect class is a category of people who have
experienced a history of purposeful unequal treatment or
been subjected to unique disabilities on the basis of
stereotyped characteristics not truly indicative of their
abilities. *Id.* Classifications based on race, national origin
and ancestry are several examples of such suspect criteria.
*Id.,* citing a number of Supreme Court cases. Rights or interests are "fundamental" for purposes of equal protection analysis under the fourteenth amendment if they are "explicitly
or implicitly" guaranteed by the federal constitution, citing
*San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 33-34, 93
S. Ct. 1278, 36 L. Ed. 2d 16 (1973). *Id.* Fundamental rights
include, among others, those guaranteed by the first amendment, the right to vote, the right of interstate travel, the
right of equal access to a criminal appeal, and the right to
procreate. *Id.,* citing Supreme Court cases.

"Heightened scrutiny" of a legislative classification is a
less exacting standard of review and is applied when a statute impacts upon "sensitive," although not necessarily
suspect criteria of classification (*i.e.,* gender discrimination),
or where a statute affects "important" personal rights or
works a "significant" interference with liberty or a denial of
a benefit vital to the individual. *Waldron, supra,* 289 Md. at

711. A legislative classification, to withstand heightened scrutiny analysis, must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly situated and circumstanced will be treated alike. This level of review does not tolerate random speculation concerning possible justification for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means chosen to effectuate that purpose. *Id.* at 713-14.

Where neither a suspect class nor a fundamental right or interest is involved or impaired, or rights or classes which would trigger heightened review are implicated, the least demanding standard of review is applied. Under this standard, a statutory classification will be invalidated only if the means chosen by the legislature are wholly irrelevant to the achievement of the State's objective. *Waldron, supra,* 289 Md. at 707. This "deferential" review of legislative classifications, variously referred to as the "reasonable" or "rational" basis test, upholds the statute when any state of facts reasonably may be conceived to sustain it. *Id.; Wheeler, supra,* 281 Md. at 602.

As we observed in *Governor v. Exxon Corp., supra,* 279 Md. at 439, quoting from *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S. Ct. 2513, 2516-2517, 49 L. Ed. 2d 511 (1976), "[u]nless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions," the constitutionality of the statutory discrimination is presumed.

### (A)

### (Federal Equal Protection)

We agree with the lower court that Maryland's system of public school finance does not violate the equal protection clause of the fourteenth amendment to the federal constitution. *San Antonio School Dist. v. Rodriguez, supra,* is dispositive of the plaintiffs' federal constitutional claim. In

that case, Mexican-American parents of children attending public schools in an urban school district in San Antonio instituted a class action on behalf of school children throughout the state who were members of minorities, or who were poor and resided in school districts having a low property tax base; they attacked Texas' statutory system of financing public school education, claiming discriminatory educational treatment and a denial of federal equal protection because public schools in each school district were funded in part by revenues realized from property taxes collected within the respective school districts. Like Maryland, the Texas system had historically relied on a combination of local property tax revenues and state funds to finance its public schools. As in Maryland, substantial disparities existed in the value of assessable property located in the state's different school districts. Texas maintained a minimum foundation program which required the state and the local subdivisions to contribute to a fund similar to Maryland's school fund for basic current expenses. While the minimum foundation program was intended to "equalize" the educational tax burden among the school districts, it did not significantly ameliorate disparities in interdistrict per pupil wealth and expenditures. Moreover, as in Maryland, each subdivision was permitted to supplement the foundation level program through an *ad valorem* tax on local property.

The Supreme Court declined to apply a strict scrutiny analysis to the Texas system, finding an absence of a suspect classification or an impingement upon a fundamental constitutional right. The Court noted that the Texas financing system did not result in the absolute deprivation of an education to any definable category of the poor; that "a large, diverse, and amorphous class, unified only by the common factor of residence in districts that happen to have less taxable wealth than other districts" lacked the traditional indicia of "suspectness" necessary to trigger strict scrutiny equal protection analysis. 411 U.S. at 28. In addition, the Court held that the test of whether the right to

an education could be deemed "fundamental" for purposes of applying the equal protection clause was not measured by the importance of the activity, but by whether the right was "explicitly or implicitly" guaranteed by the federal constitution. *Id.* at 33-34. Finding no such guarantee in the federal constitution, the Court upheld the Texas public school finance system. It concluded that the system, with its reliance on local wealth, was rationally related to its purpose of assuring a basic education for every child in the state while permitting and encouraging a large measure of participation in and control of each district's schools at the local level. *Id.* at 49, 55.

Every state appellate court which has considered the question since *Rodriguez* was decided has held that the state's school finance system does not offend the federal equal protection clause. *See Pauley v. Kelly,* 255 S.E.2d 895 (W. Va., 1979); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Illinois v. Adams,* 40 Ill. App. 3d 189, 350 N.E.2d 767 (1976); *Serrano v. Priest,* 135 Cal. Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907 (1977); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Northshore School District v. Kinnear,* 84 Wash.2d 685, 530 P.2d 178 (1974), *overruled on other grounds, Seattle School District v. State,* 90 Wash.2d 476, 585 P.2d 71 (1978); *Milliken v. Green,* 390 Mich. 389, 212 N.W.2d 711 (1973); *Shofstall v. Hollins,* 110 Ariz. 88, 515 P.2d 590 (1973); *Robinson v. Cahill,* 62 N.J. 473, 303 A.2d 273, *cert. denied,* 414 U.S. 976 (1973); *Lujan v. Colorado State Bd. of Educ.,* Colo., 649 P.2d 1005 (1982); *Board of Educ., Levittown, Etc. v. Nyquist,* 57 N.Y.2d 27, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982).

Plaintiffs seek, none too clearly, to distinguish *Rodriguez* on its facts. They claim that there was no evidence in that case, as there is in the present record, to prove that the great majority of poor children was concentrated in the poorest school districts of the state, that school districts with the greatest number of the poorest families spent the least, and that school districts with the wealthiest families spent the

most. The presence of this evidence in the record now before us, it is claimed, establishes that the Maryland school finance system arbitrarily disadvantages poor children throughout the state so that, regardless of the standard of equal protection review which is applied, a violation of the fourteenth amendment equal protection clause has been demonstrated. However, we see nothing in the record in this case sufficient to cause us to treat *Rodriguez* as other than wholly dispositive of the federal equal protection claim.

Moreover, the plaintiffs' efforts to distinguish *Rodriguez* must also fail in light of the recent line of Supreme Court decisions establishing purposeful discrimination as a requirement for a successful federal equal protection challenge. *See, e.g., General Building Contractors Association, Inc. v. Pennsylvania,* U.S., 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982); *Mobile v. Bolden,* 446 U.S. 55, 100 S. Ct. 1519, 64 L. Ed. 2d 47 (1980); *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). The principle of these cases, as stated in *Feeney,* 442 U.S. at 279, is that a "discriminatory purpose" implies more than intent as volition or intent as awareness of consequences; rather it implies that the decision maker (a state legislature) selected or reaffirmed a particular course of action at least in part "because of," and not merely "in spite of," its adverse effects upon an identifiable group. In the present case, not only was there no finding of purposeful discrimination, but there was not even an allegation of such an invidious motive.

### (B)

### (State Equal Protection)

The plaintiffs maintain that the lower court correctly held that the Maryland system of public school finance violates the equal protection guarantee of Art. 24 of the Maryland

Declaration of Rights. They contend, as the trial judge held, that the right to education, even if it is not fundamental under the federal constitution, is nevertheless of fundamental caliber under the state constitutional provision because, within the formulation of *Rodriguez,* the right is explicitly guaranteed by the state constitution. Plaintiffs seek to buttress their position by referring to the provisions of § 52 of Art. III of the Maryland Constitution which direct in paragraph (4) (f) that the state budget include an "estimate of all appropriations ... for the establishment and maintenance throughout the State of a thorough and efficient system of public schools in conformity with Article 8 of the Constitution and with the laws of the State." As paragraph (11) of § 52 directs the Governor to include such estimates for the public schools in the budget "without revision," and because paragraph (6) prohibits the General Assembly from amending the budget to affect the provisions made by the laws of the State for the public school system, the plaintiffs contend that public education is of such high status as to constitute a fundamental right in Maryland. Accordingly, the plaintiffs maintain that the lower court was right in concluding that the State's system of public school financing must be reviewed under the "strict scrutiny" standard, thereby requiring that the State demonstrate that the system promotes a compelling governmental interest — a test with which the Maryland system cannot comply. In addition to *Rodriguez,* the plaintiffs rely on cases which hold that the right to education guaranteed under state constitutional provisions is fundamental for purposes of state equal protection review. *See Serrano v. Priest,* 135 Cal. Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907 (1977); *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Pauley v. Kelly,* 255 S.E.2d 859 (W. Va. 1979); *Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo. 1980), *cert. denied,* 449 U.S. 824.

We have heretofore recognized the viability of the *Rodriguez* fundamental rights test in connection with federal equal protection challenges. *See Waldron, supra,* 289

Md. at 706; *Attorney General v. Johnson, supra,* 282 Md. at 309. While we have not considered the applicability of the *Rodriguez* test in determining whether a right is fundamental for purposes of equal protection review under Art. 24 of the Declaration of Rights, a number of states have considered, and rejected, that test in considering whether education is a fundamental right under state constitutional provisions similar to Art. VIII of the Maryland Constitution.[14] *See Lujan v. Colorado State Bd. of Educ.,* Colo., 649 P.2d 1005 (1982); *Board of Educ., Levittown, Etc. v. Nyquist,* 57 N.Y.2d 27, 439 N.E.2d 359, 453 N.Y.S.2d 643 (1982); *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981); *Bd. of Ed. of City Sch. Dist., Etc. v. Walker,* 58 Ohio St. 2d 368, 390 N.E.2d 813 (1979), *cert. denied,* 444 U.S. 1015 (1980); *Olsen v. State,* 276 Or. 9, 554 P.2d 139 (1976); *Thompson v. Engelking,* 96 Idaho 793, 537 P.2d 635 (1975); *Milliken v. Green,* 390 Mich. 389, 212 N.W.2d 711 (1973).[15] These cases point out that state constitutions, unlike the federal constitution, are not of limited or delegated powers and are not restricted to provisions of fundamental import; consequently, whether a right is fundamental should not be predicated on its explicit or implicit inclusion in a state constitution. The Court of Appeals of New York, in *Board of Educ., Levittown, Etc. v. Nyquist, supra,* 439 N.E.2d at 366 n. 5, articulated this view as follows:

"The inclusion in our State Constitution of a declaration of the Legislature's obligation to maintain and support an educational system is not to be

---

**14.** Our reference, in dicta, in *Waldron, supra,* 289 Md. at 724 to "the non-fundamental right of education" was reflective only of the *Rodriguez* holding that education was not a fundamental right for purposes of equal protection review under the fourteenth amendment.

**15.** The *Lujan* case points out (649 P.2d at 1018, n. 13) that those jurisdictions which find education to be a fundamental right refer to Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954). While *Brown* stated that education is "perhaps" the most important function of state and local government (at 493), the statement was made in connection with the Court's assessment of the effect of racial segregation on children during their formal years in school. The strict scrutiny test was applied in *Brown* not because education is a fundamental interest, but because classification by race is clearly suspect. *See, e.g.,* Parker v. Mandel, 344 F. Supp. 1068, 1077 (D. Md. 1972); Robinson v. Cahill, *supra.*

accorded the same significance for purposes of equal protection analysis as would be a counterpart reference to education in the Federal Constitution. The two documents are drafted from discretely different constitutional perspectives. The Federal Constitution is one of delegated powers and specified authority; all powers not delegated to the United States or prohibited to the States are reserved to the States or to the people. (U.S. Const., 10th Amdt.). Great significance accordingly is properly attached to rights guaranteed and interests protected by express provision of the Federal Constitution. By contrast, because it is not required that our State Constitution contain a complete declaration of all powers and authority of the State, the references which do appear touch on subjects and concerns with less attention to any hierarchy of values, and the document concededly contains references to matters which could as well have been left to statutory articulation (e.g., provision for superintendence and repair of canals, art. XV, § 3, scarcely to be classified a fundamental constitutional right on any view)."

In a similar vein, the Supreme Court of New Jersey, in *Robinson v. Cahill, supra,* 303 A.2d at 282, rejected the *Rodriguez* fundamental rights test, noting the vulnerability of that test when it said that "the right to acquire and hold property is guaranteed in the Federal and State Constitutions, and surely that right is not a likely candidate for such preferred treatment." *See* similar expressions contained in *Olsen, supra,* 554 P.2d at 154 (liquor by the drink); *Lujan, supra,* 649 P.2d at 1017 (mining and irrigation); *Walter, supra,* 390 N.E.2d at 818 (worker's compensation).

These cases also point out that other public services, such as police, fire, welfare, health care and other social services, which benefit the entire population, are equally as important as education, even though they may not be mentioned in the state constitution. The observation has been made by

one court that in terms of "fundamentality" there is little by way of essential difference between any of these vital areas of state concern, so that to apply a strict scrutiny analysis to legislation dealing with any of these "rights" is "to render automatically suspect every statutory classification made by state legislatures in dealing with matters which today occupy a substantial portion of their time and attention." *Parker v. Mandel,* 344 F. Supp. 1068, 1079 (D. Md. 1972). In this regard, it must be noted that many, if not all, of these rights could, within the *Rodriguez* formulation of fundamental rights, be deemed implicitly guaranteed in most state constitutions, thereby requiring application of the strict scrutiny test — a result which the defendants say is certain to wreak havoc with the ability of state legislatures to deal effectively with such critical governmental services. To conclude that education is a right so fundamental as to require strict scrutiny analysis would, the defendants say, likely render unconstitutional a substantial portion of the statutes, bylaws and practices that regulate education in Maryland. The defendants advance the further suggestion that if there must be, as the trial judge held, a compelling State interest that would justify deviation from mathematically exact dollar per pupil equality among all of the school districts, intradistrict disparities between areas, schools and even classes within schools in the same county could not be sustained. Similarly, if the right to education is fundamental, it is suggested that the State would be required to show a compelling interest for maintaining any differences among the State's school districts, even if the differences were not financial.

We agree with the view expressed in *Rodriguez* that whether a claimed right is fundamental does not turn alone on the relative desirability or importance of that right. We recognize, as do all the school finance cases, the vital role public education plays in our society. And we share the view expressed in *Lujan, supra,* that education "can be a major factor in an individual's chances for economic and social success as well as a unique influence on a child's

development as a good citizen and on his future participation in political and community life." 649 P.2d at 1017. Nevertheless, we conclude that education is not a fundamental right for purposes of equal protection analysis under Art. 24 of the Declaration of Rights.

We decline to adopt the overly simplistic articulation of the fundamental rights test set forth in *Rodriguez, i.e.,* that the existence of a fundamental right is determined by whether it is explicitly or implicitly guaranteed in the constitution. Maryland's Constitution explicitly, not to mention implicitly, guarantees rights and interests which can in no way be considered "fundamental." [16]

The directive contained in Article VIII of the Maryland Constitution for the establishment and maintenance of a thorough and efficient statewide system of free public schools is not alone sufficient to elevate education to fundamental status. Nor do the budgetary provisions of § 52 of Article III of the Constitution require that we declare that the right to education is fundamental. The right to an adequate education in Maryland is no more fundamental than the right to personal security, to fire protection, to welfare subsidies, to health care or like vital governmental services; accordingly, strict scrutiny is not the proper standard of review of the Maryland system of financing its public schools.

We note our observation in *Waldron,* 289 Md. at 708, that the strict scrutiny test "foreordains the invalidation of nearly every classification involving such analysis." We note also that where social or economic legislation is involved, as here, courts have generally avoided labeling a right as fundamental so as to avoid activating the exacting strict scrutiny standard of review. *Rodriguez* itself strongly

---

**16.** *E.g.,* Article XI-C, Off-Street Parking and Article XI-G, Financing of Loans. *See also* the following provisions in the Declaration of Rights, which provide: "that Annapolis be the place of meeting of the Legislature," Article 11; that the jury is judge of both the law and fact, Article 23; that an oath taker is entitled that the manner of administering the oath will be such as those of his religious persuasion "generally esteem the most effectual confirmation by the attestation of the Divine Being," Article 39; and that monopolies are odious, Article 41.

reflects this view, noting that education presents a myriad of intractable economic and social problems. 411 U.S. at 42. The Court, at 41-42, acknowledged its lack of expertise and familiarity with local problems implicated in the raising and disposition of public revenues associated with public education; it cautioned against imposing "too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause." The Court also counselled that "[t]he very complexity of the problems of financing and managing a statewide public school system suggests that 'there will be more than one constitutionally permissible method of solving them,' and that, within the limits of rationality, 'the legislature's efforts to tackle the problems' should be entitled to respect," citing *Jefferson v. Hackney,* 406 U.S. 535, 546-47, 92 S. Ct. 1724, 32 L. Ed. 2d 285 (1972). These principles, applicable to equal protection review of social and economic legislation, are well recognized. *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S. Ct. 2207, 57 L. Ed. 2d 91 (1978); *Idaho Department of Employment v. Smith,* 434 U.S. 100, 98 S. Ct. 327, 54 L. Ed. 2d 324 (1977); *Dandridge v. Williams,* 397 U.S. 471, 90 S. Ct. 1153, 25 L. Ed. 2d 491 (1970); *Governor v. Exxon Corp., supra,* 279 Md. at 423-26, 438; *Montgomery Co. v. Fields Road,* 282 Md. 575, 386 A.2d 344 (1978); *Lujan, supra,* 649 P.2d at 1022; *Walter, supra,* 390 N.E.2d at 819.

Plaintiffs argue that even if we reject the *Rodriguez* fundamental rights test, we should still proclaim education's fundamental character under the theory that it is an important personal right "recognized as vital to the history and traditions of the people of this State." *See Waldron* at 715, citing, *Bruce v. Dir., Chesapeake Bay Aff.,* 261 Md. 585, 276 A.2d 200 (1971). In *Bruce,* we held that a statute which, *inter alia,* prohibited oystermen and crabbers from plying their trade in a county other than their county of residence, violated what is now Article 24 of the Maryland Declaration of Rights. *See also Md. St. Bd. of Barber Ex. v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973) (absolute ban preventing cosmetologists from providing male patrons certain services

they were allowed to provide female customers was unconstitutional); *Md. Coal Etc. Co. v. Bureau of Mines,* 193 Md. 627, 69 A.2d 471 (1949) (statute exempting Garrett County strip miners from restoration procedures required of Allegany County miners was unconstitutional); *Havre De Grace v. Johnson,* 143 Md. 601, 123 A. 65 (1923) (municipal ordinance prohibiting nonresidents from soliciting or accepting passengers for hire on certain streets was unconstitutional). As is evident, *Bruce* and others of its genre involved an absolute deprivation of a right or the outright discriminatory application of a law. In the instant case, by contrast, the State's school finance system is not depriving, interfering with, or impinging upon, much less absolutely eliminating, any child's right to an adequate education. Indeed, as the history of public education in Maryland demonstrates, the State is making herculean efforts to extend more and more educational opportunities to every child. *See Rodriguez, supra,* 411 U.S. at 37-39; *Zablocki v. Redhail,* 434 U.S. 374, 388, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); *Waldron, supra,* 289 Md. at 705; *Attorney General v. Johnson, supra,* 282 Md. at 309-10. Under the rationale of these cases, even if education be deemed a fundamental right in Maryland, strict scrutiny would only be appropriate if a significant deprivation of that right occurs. Manifestly, no such deprivation is taking place; the right to an adequate education prescribed under Article VIII of the Maryland Constitution is not being denied to any child in this State.

The plaintiffs' only remaining basis for invoking the strict scrutiny standard of review rests upon establishing wealth as a "suspect" classification. Although it appears that the plaintiffs have now abandoned any such contention, we nevertheless note that the Supreme Court has never held that financial status alone, especially absent absolute deprivation of a right, creates a suspect class. *See Harris v. McRae,* 448 U.S. 297, 323, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980); *Maher v. Roe,* 432 U.S. 464, 471, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977); *Rodriguez, supra,* 411 U.S. at 20-22;

*Waldron, supra,* 289 Md. at 706; *Lugan, supra,* 649 P.2d at 1019 (citing state school finance cases declining to recognize wealth as a suspect class). We adopt the reasoning of these cases in finding the absence of a suspect class in this case.[17]

Plaintiffs next argue that "heightened review" is the appropriate standard for determining the constitutionality of Maryland's system of public school finance under Art. 24 of the Declaration of Rights because the system affects important personal rights to education and significantly interferes with or denies the exercise of such rights. Under this standard, as *Waldron* points out (289 Md. at 706), a legislative classification must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation. If this standard of review is applicable, it would, for reasons set forth hereinafter in considering the legislative purpose underlying the Maryland system of public school finance, satisfy the requirements of the "heightened review" test, *i.e.,* the means of financing the public school system do bear a fair and substantial relationship to the legitimate goal of providing an adequate education for all children, while at the same time maintaining the viability of local control. We hold, however, that the heightened review test is not applicable in this case because, as we have already observed, there has been no significant interference with, infringement upon, or deprivation of the underlying right to take advantage of a thorough and efficient education under Art. VIII of the Maryland Constitution.

We proceed then to test the constitutionality of Maryland's public school financing system under the rational basis standard of review to determine whether it reasonably furthers a legitimate state purpose. In *Milliken v. Bradley,* 418 U.S. 717, 741-42, 94 S. Ct. 3112, 41 L. Ed. 2d 1069 (1974), the Supreme Court recognized that

---

17. The recognized criteria for determining the existence of a suspect class can in no event be established by a political body, including a local school district. *Lujan, supra,* 649 P.2d at 1020.

"[n]o single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."

Similarly, in *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 410, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977), the Court observed that "local autonomy of school districts is a vital national tradition."

It is evident from the history of public education in this State that Maryland shares this view. Indeed, Maryland's public school system has been financed by a combination of local tax revenues and State contributions virtually throughout its entire history. Although the General Assembly has never explicitly stated the object of its public school financing system, it is readily apparent that a primary objective is to establish and maintain a substantial measure of local control over the local public school systems — control exercised at the local level through influencing the determination of how much money should be raised for the local schools and how that money should be spent. *See Lujan, supra,* 649 P.2d at 1043. We think the legislative objective of preserving and promoting local control over education is both a legitimate state interest and one to which the present financing system is reasonably related. Utilizing property taxation to partly finance Maryland schools is, therefore, rationally related to effectuating local control over public schools. As the court stated in *Lujan,* 649 P.2d at 1023:

"The use of local taxes affords a school district the freedom to devote more money toward educating its children than is otherwise available in the state-guaranteed minimum amount. It also enables the local citizenry greater influence and participation in the decision making process as to how these local tax dollars are spent. Some communities might place heavy emphasis on schools, while

others may desire greater police or fire protection, or improved streets or public transportation. Finally, local control provides each district with the opportunity for experimentation, innovation, and a healthy competition for educational excellence."

In a similar vein, the court in *Levittown,* in commenting on the virtues of local control, pointed out that funds for the support of the local public schools are raised through the imposition of local taxes and appropriated for school purposes pursuant to a locally approved budget process which is responsive to the needs and desires of the local community. The court noted that, to the extent that the local budget requires expenditures in excess of state aid, a direct correlation exists between the system of local school financing and implementation of the desires of the taxpayer. 439 N.E.2d at 367. In addition, the court in *Levittown* made this observation:

"Any legislative attempt to make uniform and undeviating the educational opportunities offered by the several hundred local school districts — whether by providing that revenue for local education shall come exclusively from State sources to be distributed on a uniform per pupil basis, by prohibiting expenditure by local districts of any sums in excess of a legislatively fixed per pupil expenditure, or by requiring every district to match the per pupil expenditure of the highest spending district by means of local taxation or by means of State aid (surely an economically unrealistic hypothesis) — would inevitably work the demise of the local control of education available to students in individual districts." *Id.*

As earlier indicated, the Supreme Court in *Rodriguez* held that the Texas school financing system rested on a rational basis in that it assured every child a basic education while at the same time encouraging a large measure of participation in and control over each district's schools at the local

level. 411 U.S. at 49-50. The Texas system, with its reliance on local revenues, and with its substantial disparities in school expenditures between school districts, attributable to differences in the amounts collected through local property taxation, was described by the Supreme Court as comparable to the systems employed in virtually every other state. *Id.* at 47-48. *Rodriguez* concluded that the existence of some inequality in the manner in which the state achieves its objective is not alone sufficient to declare the entire financing system unconstitutional. *Id.* at 51. *Rodriguez* reasoned that the citizens of Texas may have been justified in believing that increased local taxation would bring increased local control over educational policies even though some localities had more taxable assets than others, *id.* at 54; it said that while the "Texas system of school financing results in unequal expenditures between children who happen to reside in different districts, we cannot say that such disparities are the product of a system that is so irrational as to be invidiously discriminatory." *Id.* at 54-55.

The plaintiffs concede the desirability of a sharing between local subdivisions and the State of the financing of the public schools. They say that it is only the severe funding inequalities in poor subdivisions which they challenge and which result from the State's relegation of the chief funding burden to the localities and its failure to equalize the resulting disparities. The extant inequalities in local wealth, school expenditures and educational resources are unrelated, the plaintiffs contend, to local control over school spending. They suggest that far from promoting local spending options, the heavy impact of local wealth differences on school funding capacity inhibits local choice for all but the most affluent subdivisions. It is a fact, plaintiffs urge, that a system of funding based on unequal wealth does more to diminish than to enhance local choice.

We find plaintiffs' arguments unpersuasive in light of reason and the cited cases. We hold that Maryland's system of school finance satisfies the rational basis test. In so concluding, we are mindful of the principle that a statutory

classification tested by the rational basis standard enjoys a strong presumption of constitutionality and the party attacking it has the burden of affirmatively and clearly establishing its invalidity; a reasonable doubt as to its constitutionality is sufficient to sustain it. *Supermarkets Gen. Corp. v. State,* 286 Md. 611, 616-17, 409 A.2d 250 (1979); *Edgewood Nursing Home v. Maxwell,* 282 Md. 422, 427, 384 A.2d 748 (1978). To overcome the presumption of constitutionality, there must be a clear and convincing showing by the party assailing the legislative classification that it does not rest upon any reasonable basis, but is essentially arbitrary. *Davidson v. Miller, supra,* 276 Md. at 79; *Matter of Trader, supra,* 272 Md. at 400. Moreover, a statutory classification will not be held to violate the equal protection clause if there exists any state of facts which reasonably can be conceived to sustain it. *Governor v. Exxon Corp., supra,* 279 Md. at 439. The record in this case abounds with evidence demonstrating the virtues and desirability of local control over local public schools. That there is a significant measure of local control of public school education in Maryland is also clear from the record; indeed the plaintiffs do not contest this fact.

It is also clear from the record in this case that there is no discriminatory purpose in Maryland's school financing system, a point emphasized in *Rodriguez* with respect to the Texas system. 411 U.S. at 55. Absent purposeful discrimination, we are urged to hold that there can be no violation of Article 24's equal treatment guarantee. In view of the conclusion reached in this case, *i.e.,* that there is a rational basis for the Maryland public school financing system, we shall defer to another day whether to interpret Art. 24 as not having been violated in the absence of a showing of "purposeful discrimination."

## V

The central role of education in our society is, of course, universally accepted. As the Court of Appeals of New York observed in *Levittown, supra,* 439 N.E.2d at 369 n. 9, the issue in cases challenging the constitutionality of state public school finance systems is not whether education is of primary rank in the hierarchy of societal values, for all recognize and support the principle that it is. Nor is the issue whether there are great disparities in educational opportunities among the State's school districts, for the existence of this state of affairs is widely recognized. Neither is the issue in this case whether it is desirable, as a matter of Maryland's social policy, that the same mathematically precise amount of money should be spent on each child's public school education, without regard to the wealth of the subdivision in which the students reside. The issue is whether anything in the constitution, state or federal, requires such a result or prohibits any county, regardless of wealth, from spending any more. Necessarily, we approach these issues with "a disciplined perception of the proper role of the courts in the resolution of our State's educational problems, and to that end, more specifically, judicial discernment of the reach of the mandates of our State Constitution in this regard." *Levittown, supra,* 439 N.E.2d at 369 n. 9. The expostulations of those urging alleviation of the existing disparities are properly to be addressed to the legislature for its consideration and weighing in the discharge of its continuing obligation to provide a thorough and efficient statewide system of free public schools. *Id.* Otherwise stated, it is not within the power or province of members of the Judiciary to advance their own personal wishes or to implement their own personal notions of fairness under the guise of constitutional interpretation. The quantity and quality of educational opportunities to be made available to the State's public school children is a determination committed to the

legislature or to the people of Maryland through adoption of an appropriate amendment to the State Constitution.

> *Decree vacated; case remanded to the Circuit Court for Baltimore City for entry of a declaratory decree consistent with this opinion; costs to be paid by the plaintiffs.*

*Cole, J., dissenting:*

Today, this Court, based upon its review of the evidence in this case and its analysis of what the framers of the Constitution intended 116 years ago, places its imprimatur on an educational system which thwarts the full growth and development of a large segment of the school population. It seems to me that an educational system must be measured in light of what the needs of children are in today's world and the foreseeable future. We should not be using a hundred year-old yardstick in a time of computer technology.

I believe this Court should be committed to admonishing the legislature that it has not fulfilled its constitutional obligation to "establish throughout the State a thorough and efficient system of Free Public Schools; and [to] provide by taxation, or otherwise, for their maintenance" pursuant to Article VIII, Section I. For this Court to do less, is to render a disservice to the children of this State by approving a system which treats them unequally, thereby also violating Article 24 of the Maryland Declaration of Rights. I, therefore, respectfully dissent.

The quality of education under the present system is determined by the wealth of the subdivision in which the child lives. If he lives in a rich subdivision, he enjoys a fuller educational opportunity; if he lives in a poorer subdivision, he perforce is deprived of various educational advantages. The record in this case abounds with evidence to support the proposition that the school funding system fosters unequal educational treatment of children throughout the State.

The system divides the responsibility to fund education

between the State and the twenty-four subdivisions. The State, under a "foundation formula" for basic expenses, contributes more funds to the poorer subdivisions to offset the ability of the affluent counties to raise more revenue for this purpose. However, the foundation level of the present formula is so low that it does not begin to overcome the vast local wealth differences.[1] Montgomery County in F.Y. 1979 collected and spent from State and local revenues over $1,000 more per pupil than Somerset and Caroline Counties, $941 more than St. Mary's and $866 more than Baltimore City. Moreover, the State's policy of providing categorical aid (e.g., teacher retirement and social security) without regard to the differences in local wealth exacerbates the disparities. The wealthier subdivisions pay their teachers higher salaries and thus receive greater categorical aid. I agree with the trial court's conclusion that the result of such disparity in funding between the wealthy and poor subdivisions is substantially inferior educational resources and a reduction in educational opportunities for the children in the schools of the poorer systems.

The record is replete with examples of how the poor jurisdictions' lack of sufficient funding from the State translates into less of almost every kind of school resource and an inability to compete effectively with the more affluent subdivisions. For instance, the City's ability to attract and retain better teachers, more guidance counselors, nurses, psychologists, librarians and maintenance crews is gravely impaired, not even to mention its inability to maintain an "acceptable" class size, acquire the necessary quantity and quality of instructional materials and equipment or to supply books and provide the required number of librarians. Evidence at the trial revealed that in the City, elementary school libraries are frequently locked up two or three days a week because the system cannot afford the proper personnel. A few facts illustrate widespread disparities. The City school

---

1. Calvert County has five times the property tax base of Caroline County. Montgomery County has three times the income tax per capita base as Somerset County. Baltimore City has the highest tax rate in the State ($5.97) more than twice as large as Montgomery County ($2.82) but raises only 38% as much revenue per pupil.

system has only 140 librarians and five aides for 187 libraries while Baltimore County employs 190 librarians and 80 aides to staff 160 school libraries. Baltimore City has eliminated advanced courses in foreign languages, science and mathematics in most of its high schools while Montgomery County is able to offer data processing to a single student and bricklaying to three students.

The record clearly demonstrates that most of the poor children in this State reside in Baltimore City, Somerset, St. Mary's and Caroline Counties and are beset with special and greater educational needs. The present school funding system fails to provide the educational resources to satisfy these needs. Despite the fact that many studies have recognized the inequities imposed upon the poorer subdivisions by the State's school funding system, the General Assembly has not heeded the suggestion for equalization.

Thus, as I see it, the trial court's ruling that the existing school finance system violates both Article VIII, Section I of the Constitution and Article 24 of the Declaration of Rights is correct. I shall now explain.

I

The majority misinterprets the significance of the history underlying the Education Article of our Constitution. They seek to discern the proper interpretation of a one hundred and sixteen year-old provision of the Constitution by examining comments by some of the convention delegates as reported in unofficial sources (such as newspapers) and by noting some specific actions that historically have been taken under this provision. Newspaper articles and legislative debates are hardly the most reliable sources for extrapolating legislative intent; they certainly are not adequate substitutes for cogent analysis of the *purpose* of a provision as discerned from its historical context and basic goals. *See generally Schneider v. Lansdale,* 191 Md. 317, 61 A.2d 671 (1948). As society evolves, specific measures that were not necessarily able to further the purpose of a constitutional or statutory provision when drafted later

become practicable and well able to fulfill that purpose. The drafters seldom anticipate the changes that occur hundreds of years later in our society. The Constitution should be a living, developing document, able to fit the needs of the time of its interpretation. Therefore it becomes incumbent upon the Court to view provisions of our Constitution in context, determine their general purpose, and then apply them in our current society so as to best effectuate that purpose. In my view, the overriding purpose of both the Constitutions of 1864 and 1867 was to improve the system of education in this State, thereby assuring an effective and universal system of free public schools. This is the clear message of the history surrounding the adoption of the Education Article.

Society and the education provided therein were vastly different in the period preceding 1867 than they are today. As noted in *McCarthy v. Bd. of Education of A. A. Co.,* 280 Md. 634, 374 A.2d 1135 (1977), Maryland was "concerned" with education throughout the colonial and revolutionary era. However, this concern was manifested in public support for a very limited number of institutions. In 1826, the General Assembly enacted Chapter 162 of the Acts of 1825 to "provide for the public instruction of youth in primary schools throughout this state." This law, providing money for teachers' salaries, only became effective in counties adopting it by a majority vote. Only thirteen counties actually adopted the law. A. Crewe, *No Backward Step Was Taken* 16 (1949). It apparently did not greatly foster the development of public school systems in the counties, because, as Ms. Crewe noted, little progress was made in the ensuing years. *Id.* at 17. Even in Baltimore City, the first "public" school was not opened until 1829. *See* V. Vavrina, *The History of Public Education in the City of Baltimore, 1829-1956,* at 1 (1958).

From 1830 to 1864, schools realized varying success throughout the State. Baltimore City enjoyed by far the greatest growth and achievement. For instance, in 1839 the City had 9 schools, 16 teachers and 1,126 pupils. In 1849 there were 30 schools, 107 teachers and 6,763 students. And

in 1864 the City had 87 schools, 358 teachers and 16,086 pupils. *See id.* at 2 & 6. Furthermore, the quality of the school system "received the unqualified praise of educators who visited the schools of the city." *Id.* at 7.

By contrast, education in the counties did not develop as rapidly or as well. For instance, the first sign of the emergence of the Baltimore County school system was in 1848 when the Maryland Assembly passed a law entitled: "An Act to Establish Public Schools in Baltimore County." In 1849, this county had 60 schools and 1,858 pupils. As of 1864, the system had grown to include 103 schools and an average of 4,205 pupils. *See* A. Crewe, *supra,* at 21 & 27. However, the quality of education in the county was hampered by a variety of problems during these years: locating schoolhouses, finding qualified teachers, and coping with the inevitably sparse number of pupils in many areas. *See generally id.* at 21-26. Governor T. Watkins Ligon noted that education during this period was far from adequate and available to all children in the counties:

> The system of public instruction in Maryland (if we except the City of Baltimore, whose public schools are an honor to the State, and reflect the highest credit upon all those entrusted with their management) is in a state of the most utter and hopeless prostration. [1856 Message to the General Assembly 15.]

This obvious difference in educational quality between the City and county schools can be understood upon examining the social and economic character of the counties as opposed to Baltimore City. Population density, wealth and mobility probably were the most important factors distinguishing Baltimore from the surrounding counties. The following chart indicates the relative population densities of selected areas in 1860:

| County | Area in square miles* | Population** | Average Density per square mile |
|---|---|---|---|
| Anne Arundel | 400 | 16,568 | 41.42 |
| Baltimore [2] | 622 | 50,953 | 81.92 |
| Baltimore City | 78.3 | 210,200 | 2684.55 |
| Dorchester | 610 | 16,338 | 26.78 |
| Kent | 315 | 10,758 | 34.15 |
| Montgomery | 508 | 12,901 | 25.40 |
| St. Mary's | 360 | 8,664 | 24.07 |

*See Passano, *History of Maryland* (1901).
**See *Census Reports, 1860,* at 210-15.

This chart indicates the vast difference in the number of children accessible to a centralized school in the counties as opposed to the City. Given that a state average of 23% of the population was between the ages of five and twenty, St. Mary's County would have had only about 5½ children per square mile who potentially could be attending school. When considering that this is a county average (including heavily populated towns such as Leonardtown), the average in rural areas would be even lower. Because of this low school-age population density in many rural areas of the counties, there certainly were relatively few potential pupils within walking, or even riding, distance of a school. Therefore, the only school that could exist (if in fact any did exist) would have placed all children of varying age and achievement together in a one-room schoolhouse, taught by one teacher that managed as best he could.

In contrast, Baltimore City had an ample potential student body within easy reach of its schools. In 1864 Baltimore had 87 schools and 16,086 pupils — an average of almost 185 students per school. In contrast, Baltimore County (the most densely populated county) had an average

---

2. Because the statistics for the area of Baltimore City and County reflect the areas of these jurisdictions after an annexation by Baltimore City of a belt of County land in 1888, they are not entirely accurate for 1860. However, to the small extent that this overstates the area of Baltimore City and understates that of the County, the density figures would be even larger for the City and smaller in Baltimore County.

of only 40 students per school. Obviously, the City had a much greater opportunity not only to establish schools, but also to divide and specialize classes within these schools. This simple fact not only allowed the City schools to evolve more quickly, but also placed severe limitations on what the county schools could do under even the best possible conditions.

The legislature of course realized this and attempted to alleviate some of the problems in the rural areas. For instance, it enacted Chapter 247 of the 1837 Laws of Maryland, entitled: "An act for the distribution of School Moneys. . . . Harford County." This Act stated that funds provided to different districts should "increase . . . in proportion to the sparseness of school population in the neighborhood of a school . . . ." Measures such as these undoubtedly helped; however, they could only begin to overcome the disadvantages caused by the sparse population and the general lack of societal mobility in rural areas.

Although it is difficult to assess precisely the status of education in this State in 1864, quality schools certainly were not available in many areas. It was even suggested that one-fifth of the population of Maryland could not read. *See Debates and Proceedings of the Maryland Constitutional Convention, 1864,* at 1245. Thus, the educational situation facing the Constitutional Convention of 1864 was extremely poor in most areas.

The Convention dealt with this troubled area by adopting a mandate for free public education throughout the State. Article VIII provided for the appointment of a State Superintendent of Public Instruction and for a State Board of Education. Section 4 required the General Assembly to provide a "uniform system of free public schools" to be kept open at least 6 months a year. Section 5 further provided that the system be funded by a State tax of at least $.10 per $100 of taxable property throughout the State. The revenue derived from this tax was to be distributed to its subdivisions in proportion to their respective population between the ages of 5 and 20 years. This funding scheme clearly was designed

to assure the free education of the poor in rural areas. It proposed to establish an effective, universal system of free public education, thereby improving the educational opportunity of the children of the State.

The only problem that ultimately arose under this constitutional scheme was the way in which it was implemented by appointed State Superintendent Van Bokkelen. The following excerpts suggest the problems caused by this man and the actual reasons for the demise of the system under his supervision:

> State Superintendent Van Bokkelen, while awaiting returns from his letters of inquiry to the various counties, visited several northern states to study their school systems. With the information secured from both sources, he drafted a long bill to establish a Uniform System of Public Instruction for the State of Maryland, and a complete commentary explaining its features.* It was a courageous ideal, but, involving as it did an *attempt to establish at one leap a system more elaborate than any other State* in the Union was supporting at that time, it ran into difficulties almost immediately. While the General Assembly in 1865 enacted school laws which, in the main, followed the State Superintendent's recommendation, *objections were soon voiced to the seeming autocratic domination of this man who appeared to be convinced that the State, lagging so far behind in the field of education, had no time for gradual development.*

> \* \* \*

> Uniform textbooks were adopted for the entire State, . . . State Law provided that *all schoolhouses should be built and furnished according to plans\*\* and drawings issued from the office of the State Superintendent,* or plans from the County Boards which had been submitted to and approved by the Superintendent.

This first State School System lasted from 1864 to 1867, by which time *antagonistic public sentiment had been aroused and so crystalized that Superintendent Van Bokkelen's organization was swept away.* A new plan, under the Constitution of 1867, took its place. The people of Maryland had been accustomed to self-determination in respect to their schools, and resented the new system which gave no real authority to the local districts. One writer makes this commentary: * * * "It is clearly apparent that the control of the public school system was highly centralized. The State had its hands on the schools in no uncertain manner and its policies could easily be enforced. While the scheme was intended to insure a uniform system, it obviously was extreme for a State in which the citizens were accustomed to highly localized control of schools. That it was an efficient means of organizing education is hardly to be doubted."

* * *

[A] study of the Annual Reports from the various counties of the State for the two years the system existed not only fails to reveal resentment, but indicates general appreciation by school authorities of the improvements that had been made. *Political forces, rather than educational considerations, evidently were largely responsible for the repudiation of Dr. Van Bokkelen's regime.* [A. Crewe, *supra,* at 35-36 (emphasis supplied) (footnotes omitted).]

As suggested by this commentary, changes in the system ultimately were made largely as a political repudiation of Van Bokkelen and his autocratic control. Furthermore, the delegates in 1867 also seemed to agree that "the constitution should not be encumbered with the details." Perlman, *Debates of the Maryland Constitutional Convention of 1867,*

at 202. However, as is clear from a thorough examination of the constitutional changes made in 1867, the main purpose of this first Education Article was carried forward in the revised Constitution.

The 1867 Constitution provided as its basic guarantee:

> The General Assembly, at its First Session after the adoption of this Constitution shall by Law, establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance.

That the new provision was meant to perpetuate the essential purpose of the 1864 Education Article (although without an autocratic Superintendent or specific rules) is clear from the language of the provision and from examining several proposed changes that were soundly rejected.

First, on its face, the provision mandates that it is the *State's* responsibility to provide for the maintenance of the school system. It also requires that it be a "thorough and efficient system of free public schools." Therefore, the language suggests that the Convention was still interested in improving the education system and not reverting to an ineffective system of localized education. This demonstrates that the provision's purpose still was for the State to ensure an effective and universal system of free public schools.

The Convention's rejection of three proposed changes in the Education Article support his interpretation. A proposal that would have authorized the *county* boards of education to provide the system of education and funding for their own counties was soundly rejected (90 to 6). The Convention also defeated a motion to authorize varying public schools as they may have been suited to different localities. Finally, a motion to allow Baltimore City to have a separate school system also was defeated. The defeat of these motions demonstrates a singular purpose: to continue State responsibility for the effectiveness of the educational system, not to sanctify local autonomy.

In the ensuing session of the General Assembly in which that body implemented the constitutional mandate, the State did not abandon the counties, but rather pursued the purpose of the Education Article by ensuring through the action of the *State* government, the continuation of an effective and universal system of free public education. *See* 1868 Md. Laws ch. 407. This Act imposed a $.10 statewide property tax (the same as that required under the 1864 Constitution) to support the public schools throughout the State. This money was to be distributed to the jurisdictions throughout the State on a school-age population basis. As suggested in the 1867 Annual Report of the State Superintendent of Public Instruction arguing for continuation of this tax, the new system ultimately was to remain a system by which the State guaranteed an effective and universal system of free schools:

> Population and wealth often are in an inverse ratio. Where children are numerous, capital does not always abound. Where the number of schools needed in proportion is greatest, the means to sustain schools is often least. If each county be left to himself; in one-third of the State there cannot be a "thorough and efficient system of Free Public Schools," without placing a burden upon the people which they cannot bear, and ought not to be required to bear when the circumstances are remembered by which their taxable property has been diminished. *The Constitution decrees efficient Free Schools throughout the State.* This will be practicable only by a tax upon the property of the whole State, distributed among the counties according to their educational wants, which for practical purposes, means according to population. The children belong to the State in a higher and nobler sense that Sparta claimed, and are entitled to equal educational privileges without reference to the section in which they chance to be born. *Education is a State, not a county interest.* The commonwealth

suffers by ignorance, idleness and crime, whether at
its extremities or at its heart. [Report at 36-37
(emphasis supplied).]

The issue the Court should address is whether the current
system of financing public education effectuates the basic
purpose of the Education Article of the Maryland Constitution. To reiterate, this purpose was to improve the discouraging status of education in this State, ensuring an effective and universal system of free public schools. In my opinion, the system of education funding currently in effect in Maryland does not pursue this fundamental purpose.

Under the current system, the State does not ensure an effective and universal system of education. The State fails to collect and then distribute to the counties a state-wide tax adequate to support universal quality education: rather, the present system relies on the various localities to provide the education they can afford. The result is vastly dissimilar educational opportunities for children in the various jurisdictions within this State. This situation does not effectuate the Education Article's purpose of ensuring an effective and universal system of free public schools. In order to reach this goal, the State must provide as effective an education as its resources allow to all children in this State. A system designed to effectuate the purposes of the Constitution should improve the public school system, not abdicate responsibility to the various localities. The goal should be to pursue an equal basic educational opportunity for all.

One might attempt to argue that such a standard is contradicted by history. For instance, history indicates that school systems were not of equal quality after the institution of the Education Article. Furthermore, as the majority is quick to point out, under the 1867 Constitution local jurisdictions could cause themselves to be taxed to have additional funds for their school systems. However, neither of these points rebuts my analysis of the purpose of this provision.

Without question, history indicates that the quality of education differed from county to county in 1864 and 1867. These differences were due, in part, to the wealth of the county, the sparseness of its population and the poor conditions of travel. The one-room school house was classic. The poorly trained teacher was the order of the day in most rural and poor areas, being the local preacher or one of the more literate adults. The purpose of the Education Article, as I see it, was to correct these conditions but in many instances the obstacles could not be easily overcome because of widespread population and the lack of adequate transportation.

However, today, the threshold factors, which stifled educational opportunity for Maryland's children in 1864, have vanished. Even in rural areas, the improvement of roads and modes of transportation allow any subdivision to assemble enough students to divide classes by age and achievement and when supplied with properly trained teachers, books, and equipment, to expose these children to equal educational learning experiences. In my view the purpose of the Education Article in 1867 was to reach this goal; it certainly can be reached today.

It is true that under the 1864, as well as the 1867, Constitution local jurisdictions could supplement State funds. *See* A. Crewe, *supra,* at 31. However, this local option to raise additional funds must be viewed in context. At that time, the State apparently was providing sufficient money to fund a basic equal educational opportunity throughout the State.[3] If the State does provide enough money to establish an equal basic educational opportunity per child in every county, then there is not the same ground for objecting to the county supplementing these funds. However, the State can not abdicate to the counties its responsibility to provide funds for that basic educational opportunity in the first instance.

---

3. In 1864, apparently only two counties augmented their school funds by additional taxes. *See* A. Crewe, *No Backward Step Was Taken* 31 (1949). Furthermore, the same amount of revenue was raised and distributed under the 1867 Constitution. *Id.* at 38. If these funds were sufficient to provide a uniform education in 1864, they also should have been sufficient to provide basic equal educational opportunity in 1867.

Under the present system, the State manifestly does not provide sufficient funds to jurisdictions throughout this State to ensure basic equal educational opportunity. The State foundation level for basic current expenses is only $690, and the State funds an average of less than 55% of this amount. This certainly is not sufficient to provide for a child's education (especially considering a 1978 average basic cost per pupil of $1,843). In effect, the State has abdicated its responsibility to local jurisdictions and rationalized its remissness by extolling the virtues of local control. However, local control may be more efficaciously furthered by allowing localities decision-making authority with adequate funding levels provided by the State. Because the purpose of the constitutional provision was for the State to ensure an effective and universal system, children should not have to look to localities of varying wealth for their basic educational opportunity. Therefore, the current system violates the mandate of the Education Article of the Maryland Constitution.

I also dissent because the majority does not recognize that education is a fundamental right in Maryland; therefore, the majority's analysis of the State equal protection guarantee is mistaken.

The majority recognizes that education is dealt with explicitly in the Maryland Constitution. The educational guarantee is mentioned in § 52 of Article III, which provides that the State budget include an estimate of appropriations for establishing and maintaining a thorough and efficient system of public schools throughout the State. However, § 1 of Article VIII establishes a clear mandate to the "General Assembly to establish [a] system of free public schools": "The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance." Based on these provisions the trial court found education to be a fundamental right in this State, protected by the equal protection guarantee of Article 24 of the Maryland

Declaration of Rights. In reaching this conclusion, the trial court relied on the test enunciated in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973), for determining what rights are fundamental for the purpose of equal protection review, because our cases implicitly accept the *Rodriguez* formulation. Under this test, a right is fundamental if "explicitly or implicitly guaranteed by the Constitution." *Id.* 411 U.S. at 33-34. An examination of two of this Court's seminal equal protection cases demonstrates that the trial court applied the proper test for determining fundamental rights protected by the Maryland Declaration of Rights.

Our analysis in *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981), encompassed not merely federal but also state equal protection law. There Judge Digges pointed out for the Court that "[i]t is, perhaps, because this State has no express equal protection clause that Article 24 has been interpreted to apply 'in like manner and to the same extent as the Fourteenth Amendment of the Federal Constitution.'" *Id.* at 704 (citations omitted). In examining the Supreme Court's analysis of cases under the equal protection clause, the *Waldron* court cited the test for determining fundamental rights outlined in *Rodriguez.* After outlining equal protection law (including this test as an essential aspect of the analysis), the Court stated: "When evaluating an equal protection claim grounded on Article 24, we utilize in large measure the basic analysis provided by the United States Supreme Court in interpreting the like provision contained in the fourteenth amendment." *Id.* at 714.[4] This was a clear indication from the Court that we adopt the *Rodriguez* test for determining what rights are considered fundamental. As applied by the Supreme Court, this test requires an examination of the federal constitution

4. The Court, of course, recognized in a footnote that "the State equal protection principle is possessed of independent animation . . . ." Attorney General v. Waldron, 289 Md. 683, 714 n. 20, 426 A.2d 929 (1981). Therefore, this Court could reach a result at variance with the Supreme Court's interpretation of the federal equal protection clause. However, this did not diminish the strength of the Court's suggestion that the fundamental form of the analysis in which we engage is similar to that outlined by the Supreme Court.

to determine whether the right has been guaranteed. However, having adopted the framework of the Supreme Court's analysis, it seems logical to me that this Court examine the Maryland Constitution, in this light, to determine the fundamental rights guaranteed by Article 24 of the Maryland Declaration of Rights.

This position was also suggested by the Court in *Attorney General v. Johnson,* 282 Md. 274, 385 A.2d 57 (1978). The Court stated: "Thus, although we have indeed held that in Maryland the right to a fair and impartial jury in a civil action is a fundamental one, *see Davidson v. Miller,* 276 Md. 54, 68-69, 344 A.2d 422, 431-32 (1975), in accordance with the principle that a fundamental right is one explicitly or implicitly guaranteed by the Constitution, *see San Antonio School District v. Rodriguez,* 411 U.S. 1, 33-34, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973),[34] . . ." *Id.* at 309. Footnote 34 indicated that this fundamental right was provided by reference to the Maryland Constitution because "[t]he right to civil trial by jury in state courts is not explicitly guaranteed by the United States Constitution, nor has the seventh amendment right thus far been required of the states as a matter of federal due process through the fourteenth amendment." *Id.* at 309 n. 34. Thus, *Johnson* provides another example of this Court's prior belief that *Rodriguez* announced the appropriate test.

The majority holds that education is not a fundamental right in Maryland and because there is a rational basis for the constitutional provision there is no denial of equal protection. The majority while recognizing that education is dealt with explicitly in the Constitution further contends that the test for determining if a right is fundamental enunciated in *San Antonio School District v. Rodiguez,* 411 U.S. 1, 33-34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (that a fundamental right is one explicitly or implicitly guaranteed by the Constitution) should not be adopted to evaluate state equal protection guarantees, because "state constitutions, unlike the federal constitution, are not of limited or delegated powers and are not restricted to provisions of fundamental import. . . ."

The majority relies on several cases, a careful analysis of which demonstrates that it has overreacted to theoretical possibilities suggested by other courts that simply are not applicable in Maryland. As the New York court in *Board of Educ., Levittown, Etc. v. Nyquist,* 57 N.Y.2d 27, 439 N.E.2d 359, 366 n. 5, 453 N.Y.S. 2d 643 (1982), stated "the document [New York Constitution] concededly contains references to matters which could as well have been left to statutory articulation. . . ." This argument appears reasonable on its face. In fact, it is viable for most of the cases cited by the majority; however, a close examination of the state constitutions in jurisdictions making this argument indicates that they are different in relevant respects from the Maryland Constitution. Each of these constitutions guarantees services of some sort that clearly should not be accorded status as fundamental rights; this is the difference. The Maryland Constitution might *mention* some non-fundamental areas; it does not *guarantee* any right that is not fundamental.

In New York, for instance, the constitution includes Articles that arguably would guarantee rights that certainly are not fundamental. Article XIV, governing conservation, provides that "[t]he lands of the state, now owned or hereafter acquired, constituting the forest preserve as now fixed by law, shall be forever kept as wild forest lands." Article XV, § 1 precludes the legislature from selling or disposing of certain canals. Article XVII states in sections 1 and 3 that the state shall provide for the protection of health and the support of the needy. Each of these provisions commands the legislature to act in these areas. Therefore, if New York were to adopt the *Rodriguez* test, residents would have fundamental rights in these areas just as they would in education. Faced with this dilemma, it was logical for the New York court to reject this test.

The other jurisdictions that made similar arguments are encumbered with like provisions in their constitutions, mandating action by the legislature in non-fundamental areas. For instance, the Idaho Constitution, Article XV, § 4

guarantees continuing water rights to any waters that have been "appropriated or used for agricultural purposes." Article X, § 1 states: "Educational, reformatory, and penal institutions, and those for the benefit of the insane, blind, deaf and dumb, and such other institutions as the public good may require, shall be established and supported by the state in such manner as may be prescribed by law." In Colorado, Article XVI, § 2 of the constitution requires that "[t]he general assembly shall provide by law for the proper ventilation of mines, the construction of escapement shafts, and such other appliances as may be necessary to protect the health and secure the safety of the workmen therein. . . ." Article XXIV, § 3 provides that certain residents of Colorado are entitled to pensions. The Oregon Constitution provides in Article I, § 39 that the legislature shall carry out the intent of this provision, allowing the sale of liquor by the drink. Finally, Article VII, § 1 of the Ohio Constitution states: "Institutions for the benefit of the insane, blind, and deaf and dumb, shall always be fostered and supported by the state; and be subject to such regulations as may be prescribed by the general assembly."

Two jurisdictions cited by the majority do not have similar provisions covering clearly non-fundamental areas in their constitutions. Although these cases find that education is not a fundamental right, they reach this conclusion as a matter of state law for varied reasons. For instance, the Georgia Court in *McDaniel v. Thomas,* 248 Ga. 632, 285 S.E.2d 156 (1981), seemed willing to follow the Supreme Court's lead in determining that "public school finance [is] 'an inappropriate candidate for strict judicial scrutiny. . . .' " *Id.* at 647. The court also found "of constitutional significance" the extensive treatment of education in the Georgia Constitution, suggesting that the absence of a provision imposing an obligation to equalize educational opportunity provided a reason not to afford education protection under the equal protection clause. *See id.* at 645-46. The Supreme Court of Michigan, *Milliken v. Green,* 390 Mich. 389, 212 N.W.2d 711 (1973), also found education not to be a

fundamental right based on the Michigan Constitution. In this case, the court analyzed the Constitution as a whole, finding that it referred to "a system of school districts" and "ad valorem taxation by such school districts." The court stated: "We do not find appealing the suggestion that this Court honor the obvious fact that ad valorem taxation by school districts was contemplated by our State Constitution by directing now that the entire State be reorganized into one school district or a few very large districts." *Id.* at 717.

For each of these cases in which other jurisdictions analyze their constitutions and find that education is not a fundamental right, one can cite cases from other jurisdictions holding that education is a fundamental right. For instance, in *Serrano v. Priest,* 135 Cal. Rptr. 345, 557 P.2d 929 (1976), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977), the court concluded that education was a fundamental right under the equal protection provision of the State Constitution. *See also Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977); *Pauley v. Kelly,* 255 S.E.2d 859 (W.Va. 1979); *Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo. 1980), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28.

The majority, instead of merely mimicking the rationale used in education cases from other jurisdictions, should examine the Maryland Constitution to discern whether the reasons prompting these arguments apply in this State. The majority suggests that the Maryland Constitution has similar provisions to those found in the New York Constitution, under which admittedly there might be good reason for rejecting the *Rodriguez* test. The majority concludes: "Maryland's Constitution explicitly, not to mention implicitly, *guarantees* rights and interests which can in no way be considered 'fundamental.' " [Emphasis supplied.] The majority attempts to enumerate examples of these nonfundamental guarantees in footnote 16. However, a closer examination of these illustrations indicates that these provisions could not give rise to any personal right that is not already considered fundamental by this Court.

Article VIII, § 1 clearly commands the General Assembly to act in a given area that affects personal rights. In contrast, provisions that merely mention certain areas in which the General Assembly *may* become involved clearly do not command the General Assembly to take any action. Therefore, such a provision could hardly be said to *guarantee* any right. The first two "examples" cited by the majority fall into this category. Article XI-C, § 1 provides that "[t]he General Assembly of Maryland, by public local law, *may* authorize the Mayor and City Council of Baltimore . . . ." [Emphasis supplied.] to acquire and dispose of property for off-street parking. Article XI-G similarly provides that the General Assembly may authorize the City to contract to make rehabilitation and improvement loans. These provisions do not guarantee anything except the General Assembly's authority to act in these areas.

The majority's next "example" does provide an affirmative duty, yet it does not guarantee any personal right. Article 11 of the Declaration of Rights provides: "That Annapolis be the place of meeting of the Legislature. . . ." This states a clear obligation for the Legislature to meet in Annapolis, which would be violated if that body convened elsewhere. This is the only possible application of the provision; therefore, it cannot be interpreted to guarantee any fundamental right. Article 41 is another provision that establishes a self-executing directive which could not logically guarantee a fundamental right. This Article provides: "That monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered." As this Court already has established in *Grempler v. Multiple Listing Bureau,* 258 Md. 419, 266 A.2d 1 (1970), this article prohibits the State from granting any monopolies, being inadequate as a state anti-trust law. The provision is a statement of policy about monopoly, it suggests nothing about individual rights. As such, the provision provides a directive to the State, yet it does not create any personal rights.

Finally, Article 39 provides: "That the manner of administering an oath or affirmation to any person, ought to be such as those of the religious persuasion, profession, or denomination, of which he is a member, generally esteem the most effectual confirmation by the attestation of the Divine Being." If this provision guarantees a fundamental right, it is a right to religious liberty — not to have an oath administered that is violative of or ineffectual under one's religion. This right to religious liberty already is deemed fundamental in Maryland.

Therefore, although non-fundamental areas may be mentioned in the Maryland Constitution, that document does not guarantee any rights that should not be considered fundamental. In fact, "education" is the only right that I perceive would be added to those we now consider fundamental. The majority apparently is concerned that if education is deemed fundamental, other services, "such as police, fire, welfare, health care and other social services," will be evaluated under the strict scrutiny standard of review. The majority suggests this might happen because "many, if not all, of these rights could, within the *Rodriguez* formulation of fundamental rights be deemed implicitly guaranteed in most state constitutions. . . ." However, the majority fails to explain how these services are implicitly guaranteed by the Maryland Constitution. In fact, there is no convincing argument that they are guaranteed by the Constitution. The majority attempts to equate education with these other social services because they are all "important." However, despite this subjective evaluation, education *is guaranteed* by our Constitution while these other services are *not even mentioned.* I believe that this simple fact indicates that education, not every area of government endeavor, is fundamental and that applying the *Rodriguez* test will not lead to the unmanageable result apprehended by the majority.

Perhaps the most disturbing aspect of the majority opinion is that it fails to analyze the standard for determining fundamental rights under the State Constitution that it

perceives to be applicable. The majority simply "conclude[s] that education is not a fundamental right," and "decline[s] to adopt the overly simplistic articulation of the fundamental rights test set forth in *Rodriguez. . . .*" The majority notes several reasons for not declaring education a fundamental right, yet never states the standard it uses in ultimately evaluating fundamentality. In fact, the only other test the majority cites is plaintiffs' alternative argument that "[the court] should still proclaim education's fundamental character under the theory that it is an important personal right 'recognized as vital to the history and traditions of the people of this State.'"

The majority treats education as "social or economic legislation," yet their analysis is undercut by the Supreme Court's most recent examination of this subject in *Plyler v. Doe,* 50 U.S.L.W. 4650 (1982) where that Court, adhering to its prior rejection of education as a fundamental right under the federal constitution, said:

> Public education is not a "right" granted to individuals by the Constitution. *San Antonio School District, supra,* at 35. But neither is it merely some governmental "benefit" indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction. The "American people have always regarded education and the acquisition of knowledge as matters of supreme importance." *Meyer v. Nebraska,* 262 U.S. 390, 400 (1923). We have recognized "the public school as a most vital civic institution for the preservation of a democratic system of government," *Abington School District v. Schempp,* 374 U.S. 203, 230 (1963) (Brennan, J., concurring), and as the primary vehicle for transmitting "the values on which our society rests." *Ambach v. Norwick,* 441 U.S. 68, 76 (1979). As noted early in our history, "some degree of education is necessary to prepare

citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Wisconsin v. Yoder,* 406 U.S. 205, 221 (1972). And these historic "perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a democratic political system have been confirmed by the observations of social scientists." *Ambach v. Norwick, supra,* at 77. In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. *Id.* at 4655.

As this passage suggests, many factors point to the fundamentality of education.

Probably the most significant aspect of education is its nexus to other fundamental rights: a level of education is necessary to ensure effective participation in our political system; education instills interest in the political process and provides the skills necessary to evaluate and to become involved in political debate; "education is the dominant factor affecting political consciousness and participation." *San Antonio School District v. Rodriguez, supra,* 411 U.S. at 113 (Marshall, J. dissenting), citing J. Guthrie, G. Kleindorfer, H. Levin, & R. Stout, Schools and Inequality 103-105 (1971); R. Hess & J. Torney, The Development of Political Attitudes in Children 217-218 (1967); Campbell, the Passive Citizen, in 6 Acta Sociologica, Nos. 1-2, p. 9, at 20-21 (1962). Furthermore, "[e]ducation directly affects the ability of a child to exercise his First Amendment rights, both as a source and as a receiver of information and ideas, whatever interests he may pursue in life." *San Antonio School District v. Rodriguez, supra,* 411 U.S. at 112 (Marshall, J., dissenting). The reasons underlying this statement hardly require explanation. A person requires the skills of communication that are developed through education in order to evaluate sources of information and to express ideas.

Therefore, education is essential because of its nexus to these fundamental rights.

Generally, education is the most important function of any state. As stated in *Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), "[p]roviding public schools ranks at the very apex of the function of a State." The Supreme Court also recognized the importance of education in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), stating that:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms. *Id.* at 493.

The majority contends that even if a fundamental right to education exists "the State's school finance system is not depriving, interfering with, or impinging upon, much less absolutely eliminating, any child's right to an adequate education." Therefore, strict scrutiny should not be invoked. The Court again seizes on the familiar litany of cases reaching this conclusion without analyzing how these cases, and equal protection analysis, should relate to the precise issue presented in this case. An examination of several classic equal protection cases will demonstrate that the heart of the equal protection guarantee is equal treatment, which has been denied in this case.

Many cases have invoked strict scrutiny to protect against the deprivation of a fundamental right. For instance, in *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court protected the right to interstate travel. In this case, the Court held unconstitutional statutory provisions denying welfare benefits to individuals residing in a jurisdiction less than a year. This classification penalized the fundamental right to travel interstate. In *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L. Ed. 1655 (1942), an Oklahoma statute providing for the sterilization of "habitual criminals" was found to violate the equal protection guarantee. The Court evaluated the law under the strict scrutiny standard because sterilization constituted a deprivation of the criminal's fundamental right to procreate. In *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Court held that a State may not deny someone the right to vote upon failure to pay a fee or tax. The classification impinged on the fundamental right to vote and, therefore, was closely scrutinized.

These cases clearly satisfied the criterion that the State infringe on an individual's fundamental right. The fundamental rights involved a liberty to act — to travel, to procreate, to vote. The infringement inhibited or prevented the exercise of that right. This is the type of clear deprivation inherent in the traditional equal protection case that the majority insists always must be present. However, an analysis of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), indicates that this clear infringement is not always required before invoking strict scrutiny. In *Reynolds,* a denial of equal treatment affecting the exercise of a fundamental right supplied the infringement necessary to invoke strict scrutiny. The plaintiffs were not denied the right to vote; they merely claimed that the malapportionment of the Alabama Legislature diluted their votes, thereby depriving them of rights under the equal protection clause. The Court agreed that any discrimination as to the weight of votes is suspect, because "the concept of

equal protection has been traditionally viewed as requiring the *uniform treatment* of persons standing in the same relation to the governmental action questioned or challenged." *Id.* 377 U.S. at 565 (emphasis supplied) *quoted in DuBois v. City of College Park,* 286 Md. 677, 690, 410 A.2d 577 (1980). This lack of uniform treatment in relation to the right to vote offended the equal protection guarantee.

*Reynolds* focuses our attention on the essence of the equal protection guarantee — equal or uniform treatment. This unequal treatment usually is manifested in a denial of someone's liberty to exercise a fundamental right. However, in this case (as in the reapportionment cases), unequal treatment in relation to the fundamental right is the key to the equal protection analysis. The fundamental right in this case is not merely a right to be at liberty to act in a certain fashion — the right to pursue the education an individual might desire. The fundamental right here involves the State's obligation to provide an education and, therefore, one's right to *receive* a benefit from the State. The majority fails to see the applicability of our equal protection guarantee because, at first glance, this case does not appear to fit under the traditional test, which has not been applied to cases involving the fundamental right to receive something from the State. However, it is clear that children entitled to receive an education have been treated unequally.

Children who happen to reside in poorer counties have been provided an inferior educational opportunity. Judge Ross graphically illustrated this point in his factual findings. As he noted, "[i]n fiscal year 1978, Montgomery County spent $2,328 per pupil using the Maryland State Department of Education's definition of per pupil expenditures while Caroline County spent $1,498." Several definitions of per pupil expenditures suggested varying disparities. However, Judge Ross concluded: "regardless of the definition chosen, the reality is that a child in the wealthiest subdivision has approximately twice the amount spent on his education as a child in the poorest subdivision. . . . As a result of this lower spending capacity, the

educational resources which the plaintiffs' subdivisions afford their students are substantially inferior to those which the State's affluent subdivisions provide." Testimony indicated that this abstract allusion to resources means, in reality, that children in the poorer subdivisions have fewer (and more out-dated) books and other educational resource materials, less qualified teachers, larger classes, inadequate supporting staff, and inadequate specialized educational programs. This vast disparity in spending, which obviously translates into resources available to the children, constitutes an extreme denial of equal treatment to those entitled to receive an educational opportunity from the State.

This unequal treatment affects a fundamental right — the right to receive an education from the State. This right to receive an education clearly should be protected just as any right to act is guaranteed. The requisite "infringement" on this right is supplied by the State's unequal treatment. The State is required to provide a benefit (not merely to protect a right), therefore providing the benefit unequally infringes upon the right to receive that benefit (as surely as direct action by the State normally impairs rights). Therefore, strict scrutiny must be invoked in evaluating the school finance system.

The system cannot withstand strict scrutiny because the defendants cannot show a compelling state interest justifying the infringement. As this Court observed in *Waldron* the strict scrutiny test "foreordains the invalidation of nearly every classification involving such analysis." *Attorney General v. Waldron, supra,* 289 Md. at 708.

The state interest advanced as justification is local control; however, this interest certainly is not compelling. In fact, the interest of local control does not even substantially justify the severe inequalities presented in this case. The State has allowed children in the poorer jurisdictions to have an inferior educational experience. The evidence establishing this was substantial.

State Superintendent Hornbeck testified that the plaintiff jurisdictions had less of almost every type of educational

resource. Furthermore, he and other witnesses stressed that many children in these jurisdictions (particularly Baltimore City with approximately 40% of the State's poor children) suffer from severe learning problems. Therefore, even more resources and individual attention are needed to cope with these problems. The results of these inequalities are obvious. Test results indicate statistics such as 83% of fifth grade schools reporting higher than normal test results in Montgomery County, while only 5% of the schools in Baltimore City were above the norm.

Local control is an elusive term to those jurisdictions that don't have enough funds to make many decisions about what resources will benefit their children. Whatever benefits local control may entail, they certainly do not justify a system giving a vastly inferior educational opportunity to students in poor jurisdictions throughout the State. Therefore, the school finance system clearly does not pass the test of strict scrutiny.

In my view, equal treatment is required in order to comply with the constitutional mandate. By equal treatment, I mean that every district should be supplied the resources it needs to give each pupil therein a full educational program and as much opportunity for the individual to progress satisfactorily as any other school system.

It is apparent that only the General Assembly could implement this system. Certainly local school systems cannot be responsible for evaluating their own needs. Neither could all the systems be expected to agree on the levels of funding necessary to meet the needs of their children equally. In fact, if left to the individual jurisdictions, some might be unwilling, or unable, to raise sufficient revenue to meet even a commonly agreed upon level of spending. Therefore, it is apparent that the General Assembly must provide the resources necessary to establish equal educational opportunity throughout the State.

I do not propose or suggest how or from what source the necessary funds will come. It is my view that the responsibility of the Court is to advise the General Assembly that it has

not met its constitutional obligation. Once informed, I have every confidence that that honorable body will make amends forthwith.